# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued October 19, 2020      Decided January 22, 2021

No. 19-5231

BAAN RAO THAI RESTAURANT, ET AL.,
APPELLANTS

v.

MICHAEL R. POMPEO, SECRETARY OF THE U.S. DEPARTMENT
OF STATE AND UNITED STATES OF AMERICA,
APPELLEES

Appeal from the United States District Court
for the District of Columbia
(No. 1:19-cv-00058)

*Scott D. Pollock* argued the cause for appellants. With him on the briefs were *Christina J. Murdoch* and *Thomas K. Ragland*.

*Matthew J. Glover*, Counsel, U.S. Department of Justice, argued the cause for appellees. With him on the brief were *R. Craig Lawrence* and *Peter C. Pfaffenroth*, Assistant U.S. Attorneys.

Before: SRINIVASAN, *Chief Judge*, and HENDERSON and PILLARD, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* HENDERSON.

KAREN LECRAFT HENDERSON, *Circuit Judge*: The doctrine of consular nonreviewability prevents a federal court from second-guessing a United States consular officer's decision to issue or withhold a visa. Appellants Baan Rao Thai Restaurant (Baan Rao), Somporn Phomson and Napaket Suksai (Phomson and Suksai) seek review of a consular officer's decision to deny visas for Phomson and Suksai, asserting their claims fall within one of the doctrine's narrow exceptions. Specifically, they argue the Treaty of Amity and Economic Relations between the United States and Thailand— the underlying authority for the visas Phomson and Suksai seek—expressly provides that judicial review is available. Their argument fails, as it seeks to fashion a longstanding, common and well understood treaty provision into something it is not. Using the consular nonreviewability doctrine, the district court dismissed their claims for lack of subject matter jurisdiction. As recently clarified by the United States Supreme Court, however, a dismissal pursuant to the consular nonreviewability doctrine is a dismissal on the merits. Accordingly, we affirm the district court's dismissal but do so on the merits.

## I. BACKGROUND

Since 2008 Baan Rao has provided Minot, North Dakota with Thai cuisine. It often employs Thai nationals as chefs. In order to work for Baan Rao, Thai nationals utilize E-2 "essential employee" visas under the Treaty of Amity and Economic Relations between the United States and Thailand (U.S.-Thailand Treaty or Treaty). *See* Treaty of Amity and Economic Relations, Thai.-U.S., art. I, May 29, 1966, 19 U.S.T. 5843 [hereinafter U.S.-Thai. Treaty]. Phomson and Suksai are Thai nationals who previously worked as chefs at Baan Rao on E-2 "essential employee" visas. Phomson was

first granted an E-2 visa and admitted to the United States in 2012; he extended his visa in 2014, 2016 and 2017. He worked as a Baan Rao chef from 2012 to 2018. Suksai was granted an E-2 visa and admitted to the United States from 2010 to 2012 and she worked as a Baan Rao chef during that time.

In June 2018, in order to return to the United States and continue their employment as Baan Rao chefs, Phomson and Suksai applied for new E-2 visas at the U.S. Embassy in Thailand, asserting they were "employed . . . in a responsible capacity" within the meaning of the Treaty. *See* U.S.-Thai. Treaty, art. I, ¶ 1; 8 U.S.C. § 1101(a)(15)(E)(ii); 8 C.F.R. § 214.2(e). In July 2018, the Embassy denied Phomson's and Suksai's applications, concluding both "did not meet all of the requirements of an E-2 essential employee as specified in [the Department of State's Foreign Affairs Manual]." Compl. at 4, *Baan Rao Thai Rest. v. Pompeo*, No. 19-cv-00058 (D.D.C. July 29, 2019), ECF No. 1. Phomson and Suksai reapplied for E-2 visas in September 2018 and the Embassy again denied both applications.

On January 10, 2019, Baan Rao, Phomson and Suksai filed suit against the Secretary of the United States Department of State (Secretary), seeking declaratory and injunctive relief on two causes of action. In Count I, they claimed the Secretary "erred as a matter of law and acted arbitrarily and capriciously in denying the E-2 essential employee visa applications," thus "violat[ing] the Administrative Procedure Act [(APA)]." *Id.* at 7–8. In Count II, Baan Rao claimed the Secretary imposed an *ultra vires* "requirement that an employee demonstrate he is 'essential' to the treaty investor's business," which requirement was "inconsistent with" the U.S.-Thailand Treaty. *Id.* at 8.

On May 16, 2019, the Secretary moved to dismiss or, in the alternative, transfer the case to the U.S. District Court for

the District of North Dakota. The Secretary argued the district court lacked subject matter jurisdiction to review the visa denials pursuant to the doctrine of consular nonreviewability. Baan Rao, Phomson and Suksai opposed the motion, arguing the U.S.-Thailand Treaty "limits the doctrine of consular nonreviewability in cases seeking review of the Department's decisions to deny such visas." Pls.' Mem. of P. & A. in Opp'n to the Def.'s Mot. to Dismiss or to Transfer at 1, *Baan Rao Thai Rest. v. Pompeo*, No. 19-cv-00058 (D.D.C. July 29, 2019), ECF No. 8. Baan Rao also opposed the motion to transfer.

On July 29, 2019, the district court granted the Secretary's motion to dismiss. *Baan Rao Thai Rest. v. Pompeo*, No. 19-cv-00058, 2019 WL 3413415 (D.D.C. July 29, 2019). It found "[j]udicial review of visa denials by consular officials at United States Embassies, such as the denials at issue here, is generally precluded under the broad and established doctrine of consular nonreviewability," concluding that the APA challenge was "well within the scope of the consular nonreviewability doctrine." *Id.* at *2 (citing *Saavedra Bruno v. Albright*, 197 F.3d 1153, 1159–62 (D.C. Cir. 1999)). For the *ultra vires* claim, the district court found Baan Rao and its two chefs could not avoid the doctrine of consular nonreviewability by framing the claim as a challenge to the Secretary's reading of the Treaty because the claim "squarely challenge[d] the denial of plaintiffs' visa applications." *Id.* at *5. Accordingly, the district court held it was without jurisdiction to consider the two claims, granted the motion to dismiss and denied as moot the motion to transfer. *Id.* at *6. Our review of the district court's dismissal is *de novo*. *N. Am. Butterfly Ass'n v. Wolf*, 977 F.3d 1244, 1249 (D.C. Cir. 2020).

## II. ANALYSIS

### A. Consular Nonreviewability

Consular nonreviewability shields a consular official's decision to issue or withhold a visa from judicial review, at least unless Congress says otherwise. *Saavedra Bruno*, 197 F.3d at 1159. Decisions regarding the admission and exclusion of noncitizens "may implicate 'relations with foreign powers,' or involve 'classifications [. . .] defined in the light of changing political and economic circumstances'" and, accordingly, "such judgments 'are frequently of a character more appropriate to either the Legislature or the Executive.'" *Trump v. Hawaii*, 138 S. Ct. 2392, 2418–19 (2018) (quoting *Mathews v. Diaz*, 426 U.S. 67, 81 (1976)).

The Congress has partially delegated to the Executive its power to make rules for the admission and exclusion of noncitizens. The Immigration and Nationality Act, 8 U.S.C. §§ 1101 *et seq.*, grants consular officers "exclusive authority to review applications for visas, precluding even the Secretary of State from controlling their determinations." *Saavedra Bruno*, 197 F.3d at 1156. A consular officer, then, has the authority to grant, deny or revoke any visa. *Id.* at 1156–57. Nevertheless, courts have held that claims otherwise barred by the consular nonreviewability doctrine are subject to judicial review in two narrow circumstances. First, an American citizen can challenge the exclusion of a noncitizen if it burdens the citizen's constitutional rights. *See Trump v. Hawaii*, 138 S. Ct. at 2416 (citing *Kleindienst v. Mandel*, 408 U.S. 753, 762 (1972)). The second occurs whenever the "Congress says otherwise." *Saavedra Bruno*, 197 F.3d at 1159. In other words, an exception to the doctrine exists if a "statute expressly authoriz[es] judicial review of consular officers' actions." *Id.* Neither exception applies here.

Here, both claims seek review of a consular officer's visa decisions.[1] To avoid consular nonreviewability, Baan Rao, Phomson and Suksai assert the U.S.-Thailand Treaty includes an express authorization for judicial review.[2] Their argument takes two steps. First, Article I, Clause 1 of the Treaty establishes a "qualified right of entry" for Thai and U.S. nationals to one another's country, provided they meet certain requirements. Second, Article II, Clause 2's "free access" provision is the Congress's "express authorization by law" that allows judicial review of visa decisions in order for Thai and U.S. nationals to enforce their Article I rights. According to Baan Rao, Phomson and Suksai, citizens would have no way to enforce Article I rights if Article II did not provide access to courts. Whether Article I, Clause 1 establishes a "qualified right" is of no issue because the "free access" provision argument fails regardless. We cannot read a well understood treaty provision related to procedural matters as an exception to the broad doctrine of consular nonreviewability that courts

---

[1] In district court, the plaintiffs argued their *ultra vires* claim did not challenge a particular consular officer's visa decision but rather challenged whether the Secretary's regulations properly interpreted the Treaty. Pls.' Mem. of P. & A. in Opp'n to the Def.'s Mot. to Dismiss or to Transfer at 4, *Baan Rao Thai Rest. v. Pompeo*, No. 19-cv-00058 (D.D.C. July 29, 2019), ECF No. 8. The district court found their *ultra vires* claim challenged the consular officer's two visa denials. *Baan Rao*, 2019 WL 3413415, at *5. Their opening brief here asserts only that the challenged visa denials are *ultra vires*. To the extent they challenge the relevant regulations in reply, *see* Appellants' Reply Br. 17, the argument was forfeited. *See Power Co. of Am., L.P. v. FERC*, 245 F.3d 839, 845 (D.C. Cir. 2001).

[2] They argue a treaty can override the doctrine of consular nonreviewability. The Secretary does not contest this point. Because it is uncontested, we assume without deciding that a treaty can authorize judicial review notwithstanding the doctrine of consular nonreviewability.

have recognized for almost a century. *See Saavedra Bruno*, 197 F.3d at 1159–60.

"The interpretation of a treaty, like the interpretation of a statute, begins with its text." *Medellin v. Texas*, 552 U.S. 491, 506 (2008). Article II of the Treaty states, in relevant part:

> Nationals and companies of either Party *shall have free access to courts of justice* and administrative agencies within the territories of the other Party, in all degrees of jurisdiction, both in the defense and in the pursuit of their rights. Such access shall be allowed upon terms no less favorable than those applicable to nationals and companies of such other Party or of any third country, including the terms applicable to requirements for deposit of security.

U.S.-Thai. Treaty, art. II, ¶ 2 (emphasis added). Under the appellants' reading, "free access to courts" provides for judicial review of claims usually insulated from such review—namely, consular officers' visa decisions. In our view, however, "free access to courts" is not an "express[] authoriz[ation]" for judicial review of a claim otherwise barred by consular nonreviewability. *Saavedra Bruno*, 197 F.3d at 1159. Although "free access" to courts "both in the defense and in the pursuit of their rights" has a broad sound, it by no means overrides the longstanding limit on judicial review.

Our reading that "free access to courts" is not synonymous with judicial review of claims usually insulated from review is supported by the context and history surrounding such provisions. The U.S.-Thailand Treaty is one of many "friendship, commerce and navigation" treaties that include a

provision granting "free access" or "access" to courts.[3] In 1985 Judge Henry Friendly,[4] relying on Robert Wilson's *U.S. Commercial Treaties and International Law* (1960), discussed the history and scope of "access provisions." *See Blanco v. United States*, 775 F.2d 53, 61–62 (2d Cir. 1985). "Free access" provisions "were a common feature of the generation of commercial treaties signed prior to World War I." *Id.* at 61. Their definition of "access" "made it clear that the guarantee extended only to procedural rights" like "filing fees, the employment of lawyers, legal aid, security for costs and judgment, and so forth." *Id.* at 61–62; *see also Tagger v. Strauss Grp. Ltd.*, 951 F.3d 124, 127 (2d Cir. 2020). Citizens of the treaty nations were to be afforded the same procedural protections whenever validly in court in the other nation.

After World War II, access provisions like those in the U.S.-Thailand Treaty "demonstrate[d] even more clearly that use of the term 'access' . . . [was] intended to guarantee treaty nationals equal treatment with respect to procedural matters." *Blanco*, 775 F.2d at 62. For example, a 1951 treaty between the U.S. and Israel gave "access to the courts of justice and to administrative tribunals and agencies . . . in all degrees of jurisdiction, both in pursuit and in defense of their rights."

---

[3] *See, e.g.*, Treaty of Friendship, Commerce and Navigation, Republic of Korea-U.S., art. V, ¶ 1, Nov. 28, 1956, 8 U.S.T. 2217; Treaty of Friendship, Commerce and Navigation, Japan-U.S., art. IV, ¶ 1, Apr. 2, 1953, 4 U.S.T. 2063; Treaty of Friendship, Commerce and Navigation, Den.-U.S., art. V, ¶ 1, Oct. 1, 1951, 12 U.S.T. 908; Treaty of Amity and Economic Relations, Eth.-U.S., art. VII, ¶ 2, Sept. 7, 1951, 4 U.S.T. 2134; Treaty respecting Friendship, Commerce and Navigation, It.-U.S., art. V, ¶ 4, Feb. 2, 1948, 63 Stat. 2255.

[4] Judge Friendly was "a practitioner of international law for many years before his appointment" to the Second Circuit. *United States v. Yousef*, 327 F.3d 56, 103 n.38 (2d Cir. 2003).

Treaty of Friendship, Commerce and Navigation, Isr.-U.S., art. V, ¶ 1, Aug. 23, 1951, 5 U.S.T. 550. The treaty provided that "access" "comprehends, among other things, legal aid and security for costs and judgment." *Id.* Protocol 1. In 1956, the U.S. entered a treaty with the Republic of Korea that similarly defined "access" to wit "access" "comprehends, among other things, legal aid and security for costs and judgment." Treaty of Friendship, Commerce and Navigation, Republic of Korea-U.S., art. V, ¶ 1 & Protocol 2, Nov. 28, 1956, 8 U.S.T. 2217.

These treaties—one signed only ten years before the U.S.-Thailand Treaty—make clear that their access provisions relate to procedural matters. And consular reviewability is no procedural matter. It is a longstanding judicial principle recognizing that the power to exclude aliens is "inherent in sovereignty, necessary for maintaining normal international relations and defending the country against foreign encroachments and dangers." *Saavedra Bruno*, 197 F.3d at 1159 (quoting *Mandel*, 408 U.S. at 765). Accordingly, it is "'a power to be exercised exclusively by the political branches of government' and not 'granted away or restrained on behalf of anyone.'" *Id.* (quoting *Mandel*, 408 U.S. at 765; *The Chinese Exclusion Case*, 130 U.S. 581, 609 (1889)). If the U.S.-Thailand Treaty intended to depart from this longstanding principle, one would expect some mention of such a change somewhere in the Treaty's enactment history. Instead, the Treaty's enactment history suggests it is one in a long line of standard-form commercial treaties.

When President Lyndon Johnson submitted the U.S.-Thailand Treaty to the Senate for its advice and consent, he described it as "of the short, simplified type that the United States has negotiated with a number of countries, but it contains the general substance of the typical treaty of friendship, commerce and navigation." Lyndon B. Johnson, Message from

the Pres. of the U.S. Transmitting the Treaty of Amity and Economic Relations Between the United States of America and the Kingdom of Thailand, 89th Cong. Executive P. No. 89-2, at 1. Then-Secretary of State Dean Rusk stated that the Treaty was "another in the series of treaties of friendship, commerce and navigation," was "generally similar to treaties concluded with Ethiopia and Iran" and "contains the usual provisions covering such subjects as . . . access to courts." Dean Rusk, Report to the President, 89th Cong. Executive P. No. 89-2, at 2 (citations omitted). Leonard Meeker, the State Department's then-legal advisor, testified before the Senate Foreign Relations Committee, describing the Treaty as "a shorter version of our standard treaties of friendship, commerce, and navigation" "similar to others that are now in effect." 90th Cong., Sen. Exec. Rep. No. 14, at 3–4. Meeker stated "[t]he provisions of the new treaty with Thailand are based upon existing treaty practices" and "introduce no new types of commitments affecting domestic law." *Id.* Then-Senator Mike Mansfield introduced the Treaty in the Senate and was the only Senator to speak during Senate consideration of the Treaty. 113 Cong. Rec. 24,375 (1967). He noted the Treaty "is the 21st in a series of commercial treaties which have been negotiated since 1946" and "contains the usual provisions found in other commercial treaties to which the United States is a party" including "access to courts." *Id.* That the record is devoid of any indication that those involved with the Treaty's creation understood it to be anything other than a standard treaty of friendship, commerce and navigation indicates that it was not meant to abrogate a broad and important limit on judicial review.

Simply put, the U.S.-Thailand Treaty's "free access" provision ensures uniform procedural protections to the Treaty's nationals. Access provisions were longstanding and well understood at the time the U.S.-Thailand Treaty was

entered into—and that understanding was that the provisions relate to procedural rights. Had the President or the Senate meant otherwise, we would expect to see an indication of that in the Treaty's enactment history. None exists. Accordingly, we conclude the doctrine of consular nonreviewability bars review of Baan Rao's, Phomson's and Suksai's claims and no exception to the doctrine applies.

### B.  Jurisdictional vs. Merits Dismissal

The district court dismissed Baan Rao's, Phomson's and Suksai's claims for lack of subject matter jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1). *Baan Rao*, 2019 WL 3413415, at *2–6. Dismissal based on consular nonreviewability, however, is a merits disposition under Federal Rule of Civil Procedure 12(b)(6). We may affirm the district court on a ground different from the district court's, however, if its ultimate disposition is nonetheless correct. *Kleiman v. Dep't of Energy*, 956 F.2d 335, 339 (D.C. Cir. 1992).

The district court was not without a basis for its determination that dismissal pursuant to the doctrine of consular nonreviewability is jurisdictional. In *Saavedra Bruno v. Albright*, we used "jurisdiction" in discussing the doctrine. 197 F.3d at 1162–63 ("For many of the reasons just given and for another about to be discussed, the government maintains that federal courts have no jurisdiction over actions such as Saavedra's."). Our Circuit's district court has followed the *Saavedra Bruno* language[5] and we have summarily affirmed

---

[5]  *See, e.g.*, *Aboutalebi v. Dep't of State*, No. 19-cv-2605, 2019 WL 6894046, at *4–5 (D.D.C. Dec. 18, 2019); *Jathoul v. Clinton*, 880 F. Supp. 2d 168, 171–72 (D.D.C. 2012); *Mostofi v. Napolitano*, 841 F. Supp. 2d 208, 213 (D.D.C. 2012).

several like decisions.[6] But jurisdiction "is a word of many, too many, meanings." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 90 (1998) (quoting *United States v. Vanness*, 85 F.3d 661, 663 n.2 (D.C. Cir. 1996)). As the Seventh Circuit noted, *Saavedra Bruno* "was written in 1999, before the Supreme Court's series of more recent decisions clarifying and narrowing the scope of subject matter jurisdictional doctrines, as distinct from a host of other case-processing rules." *Matushkina v. Nielson*, 877 F.3d 289, 294 n.2 (7th Cir. 2017).

Indeed, we are guided by a recent Supreme Court decision that clarified the scope of consular nonreviewability. In *Trump v. Hawaii*, the government asserted the doctrine as a defense but did "not argue that the doctrine of consular nonreviewability goes to the Court's jurisdiction." 138 S. Ct. 2392, 2407 (2018). The Court treated the doctrine as non-jurisdictional by "assum[ing] without deciding that plaintiffs' statutory claims are reviewable, notwithstanding consular nonreviewability." *Id.* Had the doctrine been jurisdictional, the Court would have had to consider the doctrine to ensure its jurisdiction. *See Steel Co.*, 523 U.S. at 94–95 ("The requirement that jurisdiction be established as a threshold matter spring[s] from the nature and limits of the judicial power of the United States and is inflexible and without exception." (internal quotations omitted)). Accordingly, we understand *Trump v. Hawaii* to instruct that the doctrine of consular nonreviewability is non-jurisdictional. *See also Avullija v. Sec'y of State*, No. 19-cv-10048, 2020 WL 7024485, at *3 (11th Cir. Nov. 30, 2020) (same). In fact, we have applied that

---

[6] *See, e.g.*, *Rohrbaugh v. Pompeo*, 394 F. Supp. 3d 128, 131 (D.D.C. 2019), *aff'd*, 2020 WL 2610600 (D.C. Cir. May 15, 2020) (per curiam); *Malyutin v. Rice*, 677 F. Supp. 2d 43, 44 (D.D.C. 2009) *aff'd*, 2010 WL 2710451 (D.C. Cir. July 6, 2010) (per curiam); *Antonenko v. Dep't of State*, No. 03-cv-5327, 2004 WL 1080159, at *1 (D.C. Cir. May 13, 2004) (per curiam).

understanding since *Trump v. Hawaii* was decided. *See Almaqrami v. Pompeo*, 933 F.3d 774, 784 n.3 (D.C. Cir. 2019) (court "may assume without deciding that plaintiffs' statutory claims are reviewable" and proceed to the merits "notwithstanding consular nonreviewability" (quoting *Trump v. Hawaii*, 138 S. Ct. at 2407)).

*Trump v. Hawaii*'s treatment of the doctrine as non-jurisdictional accords with the Constitution's framework. Article III confers subject matter jurisdiction to federal courts over "all Cases, in Law and Equity, arising under this Constitution, [and] the Laws of the United States." U.S. Const. art. III, § 2, cl. 1. The grant of subject matter jurisdiction is subject to "such Exceptions, and under such Regulations as the Congress shall make." *Id.* cl. 2. As the Ninth Circuit recognized, "[n]o statute purports to strip us of jurisdiction over consular decisions; nor does any statute purport to confer subject matter jurisdiction over the two exceptions." *Allen v. Milas*, 896 F.3d 1094, 1101 (9th Cir. 2018). Indeed, consular nonreviewability is a doctrine "judicial in origin." *Id.* It is "informed by our respect for the separation of powers" but it is not a limit on our subject matter jurisdiction as it "goes to our *willingness*, not our *power*, to hear these cases." *Id.*; *see also Matushkina*, 877 F.3d at 294 n.2.

For the foregoing reasons, the district court's judgment of dismissal is affirmed pursuant to Federal Rule of Civil Procedure 12(b)(6).

*So ordered.*