# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

Argued March 17, 2023        Decided June 23, 2023

No. 22-5009

KRISTEN H. COLINDRES AND EDVIN A. COLINDRES JUAREZ,
APPELLANTS

v.

UNITED STATES DEPARTMENT OF STATE, ET AL.,
APPELLEES

---

Appeal from the United States District Court
for the District of Columbia
(No. 1:21-cv-00348)

---

*Christopher W. Dempsey* argued the cause and filed the briefs for appellants.

*Catherine M. Reno*, Trial Attorney, U.S. Department of Justice, argued the cause for appellees. With her on the brief were *Brian M. Boynton*, Principal Deputy Assistant Attorney General, and *T. Monique Peoples*, Senior Litigation Counsel.

Before: SRINIVASAN, *Chief Judge*, WALKER, *Circuit Judge*, and RANDOLPH, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* WALKER.

Opinion concurring in part and concurring in the judgment filed by *Chief Judge* SRINIVASAN.

WALKER, *Circuit Judge*: Edvin Colindres Juarez applied for a visa to enter the United States. But the Government denied his application, fearing that he was part of a criminal organization.

Mr. Colindres and his wife — who is an American citizen — filed this suit to challenge that decision. But their suit faced an uphill struggle: With narrow exceptions, a court may not review the government's decision to deny a visa.

To show that their suit fits within an exception, the Colindreses point to a rule allowing American citizens to challenge visa denials that burden their constitutional rights. Mrs. Colindres says the rule applies here because denying her husband a visa interfered with her constitutional right to marriage.

The district court rejected that argument and dismissed. We affirm. Though marriage is a fundamental right, it does not include the right to live in America with one's spouse. So the right is not burdened when the government denies a spouse's visa application.

Plus, even if the exception applied, allowing us to review the Government's visa denial, Mrs. Colindres's challenge would fail on the merits. To survive judicial review, the Government need only cite a statute listing a factual basis for denying a visa. It did that here.

3

## I. Background

Mr. Colindres was born and raised in Guatemala. He entered the United States "without inspection" when he was fourteen. *Colindres v. United States Department of State*, 575 F.Supp.3d 121, 127 (D.D.C. 2021). For more than twenty years, he made his life in America — he got a job working for a pool company, married an American citizen named Kristen, and had a daughter.

But for all that time, Mr. Colindres did not have permission to live or work in the United States. So in 2015, he decided to fix his immigration status.

To do that, he first filed an Application for Provisional Unlawful Presence Waiver. Aliens like Mr. Colindres who are "unlawfully present" in the United States for more than six months are "ineligible to receive visas and ineligible to be admitted to the United States." 8 U.S.C. § 1182(a), (a)(9)(B)(i). An Unlawful Presence Waiver allows the Attorney General to remove that obstacle. *Id.* § 1182(a)(9)(B)(v). Here, the Attorney General granted Mr. Colindres's waiver application.

Even so, the waiver did not give Mr. Colindres permission to live in the United States. To get permission, he had to successfully apply for a visa. *Id.* §§ 1181(a); 1182(a)(7).

Visa applications are adjudicated by consular officers. *Id.* §§ 1201 (authority to issue visas); 1361 (burden of proof to show visa eligibility on the alien). So in July 2019, Mr. Colindres travelled to the U.S. embassy in Guatemala for a visa interview with a consular officer.

The officer did not resolve Mr. Colindres's application at that interview. Instead, the officer asked Mr. Colindres to

4

submit his Guatemalan criminal record. Though his record came back clean, the officer scheduled a second interview. Nearly a year later, the officer denied Mr. Colindres's visa application, finding him ineligible because "there [was] reason to believe" that he was "a member of a known criminal organization." JA 242-43 (citing 8 U.S.C. § 1182(a)(3)(A)(ii)). That decision meant he could not return to the United States.

Mr. Colindres asked the embassy to reconsider. The embassy's Immigrant Visa Chief "reviewed the evidence" and "reconsider[ed]" the consular officer's decision. JA 248. But "he did not find any compelling new information" to justify a departure from the officer's determination. *Id.*

Unwilling to accept the embassy's decision, Mr. Colindres and his wife sued the Department of State. They asked the district court to "[d]eclare" that Mr. Colindres's visa denial was "contrary to law" and to issue an injunction directing the Government to issue him a visa. JA 257.

The district court dismissed. Though it did "not take lightly" the "hardship" that the embassy's decision had caused the Colindreses, it held that judicial review was unavailable. *Colindres*, 575 F.Supp.3d at 126. The "doctrine of consular non-reviewability" bars judicial review of most visa denials. *Id.* at 140. And though there are narrow exceptions to the doctrine, none allowed the Colindreses' suit to proceed here. *Id.*

The Colindreses appealed. We review the district court's decision to dismiss de novo. *Sanchez v. Office of State Superintendent of Education*, 45 F.4th 388, 395 (D.C. Cir. 2022). Taking as true the factual allegations in the Colindreses' complaint, we agree with the district court that they failed to state a claim. *Id.* at 393. We thus affirm.

## II. Analysis

Deciding who is allowed into the United States and who is not can involve hard policy choices. Denying a visa may "implicate" America's relationship with "foreign powers" or require evaluating "changing political and economic circumstances." *Trump v. Hawaii*, 138 S. Ct. 2392, 2418-19 (2018) (cleaned up). For that reason, "the power to exclude aliens" is "a power to be exercised exclusively by the political branches," with limited judicial review. *Kiyemba v. Obama*, 555 F.3d 1022, 1025 (D.C. Cir. 2009) (cleaned up).

Reflecting the limited role of the judiciary, the consular-non-reviewability doctrine "shields a consular official's decision to issue or withhold a visa from judicial review," with two narrow exceptions. *Baan Rao Thai Restaurant v. Pompeo*, 985 F.3d 1020, 1024-25 (D.C. Cir. 2021). The first exception applies when "a statute expressly authorizes judicial review." *Id.* at 1025 (cleaned up). That exception is not at issue here because the Colindreses have pointed to no statute that allows review. The second exception lets "an American citizen . . . challenge the exclusion of a noncitizen if it burdens the citizen's constitutional rights." *Id.* at 1024.

Even if an exception applies, judicial review is narrow. It is limited to whether the officer gave a "facially legitimate and bona fide reason" for denying a visa. *Kleindienst v. Mandel*, 408 U.S. 753, 770 (1972).

Here, the Colindreses claim that the constitutional-rights exception lets them bring this challenge. First, because Mrs. Colindres is a citizen, they argue that the Government's visa denial burdened her "fundamental . . . marital right to live together" with her husband. JA 2. Second, they argue that, if the exception applies, they should prevail on the merits because the

Government did not give sufficient reasons for denying Mr. Colindres's visa.

We disagree with both arguments.

### A. The Visa Denial Did Not Burden Mrs. Colindres's Constitutional Right To Marriage

"[M]arriage is a fundamental right." *Obergefell v. Hodges*, 576 U.S. 644, 673 (2015). But a citizen's right to marry is not impermissibly burdened when the government refuses her spouse a visa.

The right to marriage is the right to enter a legal union. *See id.* at 680-81. It does not include the right to live in America with one's spouse. Thus, in *Swartz v. Rogers*, a wife challenged her husband's deportation because it burdened her "right, upon marriage, to establish a home, create a family, [and] have the society and devotion of her husband." 254 F.2d 338, 339 (D.C. Cir. 1958). This court rejected that argument because "deportation would not in any way destroy the legal union which the marriage created. The physical conditions of the marriage may change, but the marriage continues." *Id.*; *see also Rohrbaugh v. Pompeo*, 2020 WL 2610600 (D.C. Cir. May 15, 2020) (relying on *Swartz* to reject a husband's claim that denying his wife a visa burdened his right to marriage).

True, the Supreme Court has said "the right to marry, establish a home and bring up children is a central part of the liberty protected by the Due Process Clause."[1] *Zablocki v.*

---

[1] Though the Supreme Court has repeatedly held that the Fourteenth Amendment's Due Process Clause (which applies to the states) protects the right to marriage, it has not squarely held that the Fifth

*Redhail*, 434 U.S. 374, 384 (1978) (cleaned up). But "constitutional protection" is not triggered "whenever a regulation in any way touches upon an aspect of the marital relationship." *Kerry v. Din*, 576 U.S. 86, 95 (2015) (plurality op.).

Instead, constitutional protection kicks in only when "this Nation's history and practice" show that a government regulation is incompatible with a fundamental liberty interest. *Id.* (cleaned up); *see also Dobbs v. Jackson Women's Health Organization*, 142 S. Ct. 2228, 2248 (2022) (courts must be "guided by . . . history and tradition" when asking what liberty interests are protected by the Fourteenth Amendment).

---

Amendment's Due Process Clause (which applies to the federal government) also protects that right. *Cf. Abigail Alliance for Better Access to Developmental Drugs v. von Eschenbach*, 495 F.3d 695, 702 (D.C. Cir. 2007) (noting in dicta that the Fifth Amendment protects the right to marriage but citing only a case discussing the Fourteenth Amendment); *Kerry v. Din*, 576 U.S. 86, 108 (2015) (Breyer, J., dissenting) (arguing that the Fifth Amendment protects the right to marriage, but citing no case finding such a right under the Fifth Amendment); *see also Lewis v. Mutond*, 62 F.4th 587, 596 (D.C. Cir. 2023) (Rao, J., concurring) ("there are reasons to reconsider whether the personal jurisdiction limits required by the Due Process Clause of the Fifth Amendment are identical to those of the Fourteenth").

Because the Fifth and Fourteenth Amendments — enacted seventy-seven years apart — could have been subject to different "public understanding[s]" at their respective moments of ratification, they may protect different unenumerated rights. *See New York State Rifle & Pistol Association, Inc. v. Bruen*, 142 S. Ct. 2111, 2137 (2022). Here, the parties did not address whether the Fifth Amendment protects marriage to the same extent as the Fourteenth Amendment. So we assume without deciding that it does. We thus rely on the Supreme Court's Fourteenth Amendment caselaw here, even though Mrs. Colindres's claim arises under the Fifth Amendment.

Here, history and practice cut against Mrs. Colindres's claim that she has a "marital right" to live in America with her husband. JA 2. To paraphrase Justice Scalia's plurality opinion in *Kerry v. Din*, "a long practice of regulating spousal immigration precludes [Mrs. Colindres's] claim that the denial of [Mr. Colindres's] visa application has deprived her of a fundamental liberty interest." 576 U.S. at 95.

From the Founding, the government has had discretion to control entry into the United States. Consider the debates around the Alien Act of 1798. The Act gave the President unfettered discretion to remove "all such aliens as he shall judge dangerous to the peace and safety of the United States." Ch. 58, 1 Stat. 570 (1798).

Though the Act's constitutionality was vigorously debated, its supporters and detractors agreed that the government had discretion to control aliens' entry into the United States — even though they disagreed about *which* government should wield that power. Supporters argued that the immigration power was federal. George Keith Taylor thus cited Blackstone to show that "by the law of nations, it is left in the power of all states to take such measures about the admission of strangers as they think convenient." Debate on the Virginia Resolutions, *reprinted in The Virginia Report of 1799-1800*, at 31 (1850). For their part, opponents contended that "the power to admit, or to exclude alien[s]" was left "to each individual state." 8 Annals of Cong. 1955 (1798) (Statement of Rep. A. Gallatin). But even James Madison — one of the Act's strongest critics — recognized that *some* government must have the power to control entry into the United States. James Madison, Report of 1800 (Jan. 7, 1800). He "allow[ed] the truth" of the notion that the "discretionary power" to admit aliens "into the country [is] of favor [and] not of right." *Id.*

Of course, the Supreme Court eventually held that the power to control immigration was federal. *See Head Money Cases*, 112 U.S. 580 (1884). And when Congress enacted immigration legislation, it generally did not carve out exceptions for spouses.

For example, the Page Act of 1875 gave "consol[s]" at ports in Asia discretion to deny permission to come to the United States to any immigrant who "ha[d] entered into a contract or agreement for a term of service within the United States[ ] for lewd and immoral purposes." Ch. 141 § 1, 18 Stat. 477, 477-78. Though the Act was designed to stop prostitutes emigrating, consuls unfortunately treated it as a "general restriction of Chinese female immigration." George Anthony Peffer, *Forbidden Families: Emigration Experiences of Chinese Women Under the Page Law, 1875-1882*, 6 J. Am. Ethnic Hist. 28, 42 (1986). As a result, the Act "made the immigration of Chinese wives extremely difficult." *Id.* Our point is not to endorse the Act's policy or application, but simply to note that the Act did not include an exception for spouses and made no provision for judicial review of consuls' decisions. Ch. 141 § 1, 18 Stat. 477, 477-78.

Immigration statutes passed in the decades following the Page Act likewise limited spousal immigration. Take the Immigration Act of 1882. It required the Treasury Secretary to "examine" aliens arriving at United States ports and to deny "permi[ssion] to land" to "any convict, lunatic, idiot, or any person unable to take care of himself or herself without becoming a public charge." Ch. 376 § 2, 22 Stat. 214. And the Act contained no exceptions for citizens' spouses. *See also* Immigration Act of 1891, Ch. 551 § 1, 26 Stat. 1084 (expanding grounds of inadmissibility and allowing only administrative review).

Similarly, when Congress started to impose numerical limits on immigration in 1921, those limits applied to citizens' spouses. The Emergency Quota Act of 1921 put a cap on the number of immigrants who could come to the United States each year. Ch. 8 § 2, 42 Stat. 5, 6. Though it gave preferred status to citizens' wives (but not husbands), it did not guarantee them a quota spot. *Id.* "In other words, a citizen could move his spouse forward in the line, but once all the quota spots were filled for the year, the spouse was barred without exception." *Din*, 576 U.S. at 97.

To sum up, from early federal immigration legislation to today, Congress has sometimes limited spousal immigration. To be sure, on other occasions, Congress has facilitated citizens bringing their spouses to America. *See, e.g.*, War Brides Act of 1945, 59 Stat. 659. But Congress's "long practice of regulating spousal immigration" confirms that citizens have no fundamental right to live in America with their spouses. *Din*, 576 U.S. at 95.

Because the Colindreses cannot show that the Government's visa denial burdened Mrs. Colindres's fundamental rights, their suit does not fall within the constitutional-rights exception to the consular-non-reviewability doctrine. *See Baan Rao Thai Restaurant*, 985 F.3d at 1024-25.[2]

---

[2] Our conclusion is consistent with *Kleindienst v. Mandel,* 408 U.S. 753 (1972). *Cf.* Concurring Op. 1-2. There, the Supreme Court said that an American professor's First Amendment "right to receive information" was "implicated" when the government denied a visa to a Marxist who was due to speak at the professor's university. *Mandel*, 408 U.S. at 764-65. But because the government had adequately explained its visa denial, the Court expressly refused to decide what the First Amendment requires in that context. *Id.* at 770 ("What First Amendment or other grounds may be available for attacking exercise

### B. Even If The Visa Denial Is Reviewable, The Government Met Its Burden

Even if the Colindreses could get judicial review, their claim would fail on the merits.

When the constitutional-rights exception to the consular-non-reviewability doctrine applies, judicial review is "deferential." *Trump v. Hawaii*, 138 S. Ct. 2392, 2419 (2018). Courts ask only whether the government has given "a facially legitimate and bona fide reason" for denying a visa. *Mandel*, 408 U.S. at 770.

That requirement is easy to satisfy. It "mean[s] that the [g]overnment need provide only a statutory citation to explain a visa denial." *Hawaii*, 138 S. Ct. at 2419. Citing a statutory provision that "specifies discrete factual predicates the consular officer must find to exist before denying a visa" is enough. *Din*, 576 U.S. at 105 (Kennedy, J. concurring). And even if the government fails to cite such a statute, it may still meet its burden by "disclos[ing] the facts motivating [its] decision." *Id.*; *see also Mandel*, 408 U.S. at 769.

---

of discretion for which no justification whatsoever is advanced is a question we neither address nor decide in this case."). So it may be that the government does not violate the First Amendment when it denies a visa for no reason at all. That is important because the first step in the consular-non-reviewability doctrine is satisfied only if a citizen's rights are "burden[ed]." *Baan Rao Thai Restaurant*, 985 F.3d at 1024-25. Regardless, we need not tackle that question today because the Colindreses do not argue that Mrs. Colindres's First Amendment right to "sustained, face-to-face interaction" with her husband is implicated by the government's visa denial. Concurring Op. 2.

Here, the consular officer's decision to deny Mr. Colindres's visa satisfies that standard. The officer refused Mr. Colindres's visa application under 8 U.S.C. § 1182(a)(3)(A)(ii). That provision specifies a factual predicate for denying a visa: The alien must "seek[ ] to enter the United States to engage . . . [in] unlawful activity." 8 U.S.C. § 1182(a)(3)(A)(ii). And the officer explained why that provision was satisfied here: There was "reason to believe [Mr. Colindres] is a member of a known criminal organization." JA 7-8. That was all the officer was required to do.

To be sure, § 1182(a)(3)(A)(ii) "does not specify the type of lawbreaking that will trigger a visa denial." *Munoz v. Department of State*, 50 F.4th 906, 917 (9th Cir. 2022) (holding that § 1182 does not contain discrete factual predicates). But that level of specificity is not required. In *Din*, Justice Kennedy said that a provision making terrorists inadmissible was detailed enough. *Din*, 576 U.S. at 105 (Kennedy, J., concurring) (citing § 1182(a)(3)(B)). And that provision is written in the same general terms as the provision at issue here. *Compare* § 1182(a)(3)(B)(i)(II) (an alien is inadmissible if "a consular officer . . . has reasonable ground to believe" that the alien "is engaged in or is likely to engage after entry in any terrorist activity"), *with* § 1182(a)(3)(A)(ii) (an alien is inadmissible if "a consular officer . . . has reasonable ground to believe[ ] [that the alien] seeks to enter the United States to engage . . . [in] unlawful activity").

Thus, here, as in *Din*, the Government's statutory "citation . . . indicates it relied upon a bona fide factual basis for denying" Mr. Colindres's request for a visa. *Din*, 576 U.S. at 105 (Kennedy, J., concurring).

As a fallback, the Colindreses assert that the Government's visa denial was in "bad faith" because its stated reasons for

denying the visa were "pretextual" and "not based on the . . . merits." Colindres Br. 51-53. True, an "affirmative showing of bad faith on the part of the consular officer" can demonstrate the government failed to give a "bona fide" reason for its actions. *Din*, 576 U.S. at 105-106 (Kennedy, J. concurring). But because courts "presume" that "public officers" have "properly discharged their official duties," a litigant must provide "clear evidence" of bad faith. *United States v. Chemical Foundation, Inc.*, 272 U.S. 1, 14-15 (1926).

The Colindreses do not do that here. Instead, they point to evidence in the record — Mr. Colindres's clean criminal history and his lack of gang tattoos, for example — that they say undercuts the Government's decision. Colindres Br. 51-52. But disagreeing with the Government's decision to discount that evidence falls well short of the kind of clear showing necessary to establish bad faith. *Cf. NRDC. v. SEC*, 606 F.2d 1031, 1049 n.23 (D.C. Cir. 1979) (giving examples of evidence sufficient to rebut the presumption of agency regularity); *Hartman v. Moore*, 547 U.S. 250, 264 (2006) (the similar presumption of prosecutorial regularity can be rebutted when a prosecutor admits to improper "retaliatory thinking" or "rubber stamp[ing]" decisions).

The Colindreses' challenge thus fails on the merits. The Government met its burden by giving a facially legitimate and bona fide reason for denying Mr. Colindres a visa.

## C. The Colindreses' Other Arguments Are Not Properly Before The Court

The Colindreses raise two other arguments to challenge the Government's visa denial, but neither is properly before us.

First, the Colindreses assert that the statute under which Mr. Colindres was denied a visa is unconstitutionally vague. *See* 8 U.S.C. § 1182(a)(3)(A)(ii); Colindres Br. 36. But the district court held that they forfeited that argument by "failing to address it" in their opposition to the Government's motion to dismiss. *Colindres v. United States*, 575 F.Supp.3d 121, 130 (D.D.C. 2021). Because the district court did not abuse its discretion by finding forfeiture, we may not address the Colindreses' vagueness argument now. *See Texas v. United States*, 798 F.3d 1108, 1110, 1114-15 (D.C. Cir. 2015) (this Court has "yet to find" that a district court's application of the failure-to-respond forfeiture rule was an abuse of discretion (cleaned up)).

Second, the Colindreses contend that the visa denial violated the Equal Protection Clause. But they forfeited that argument by raising it in a single-sentence footnote of their appellate brief. Colindres Br. 47, n.5; *see also CTS Corp. v. EPA*, 759 F.3d 52, 64 (D.C. Cir. 2014) ("hiding an argument" in a footnote "and then articulating it in only a conclusory fashion" is "forfeiture").

\* \* \*

To get judicial review, the Colindreses must show that the Government's decision to deny Mr. Colindres a visa burdened Mrs. Colindres's constitutional rights. They cannot do that here.

And even if they could, the Government would win on the merits. To survive judicial review, it need only cite a statute listing a factual basis for denying a visa. It did that here.

SRINIVASAN, *Chief Judge*, concurring in part and concurring in the judgment: The court today affirms the dismissal of the Colindreses' complaint, and I agree with that ultimate disposition. I also join Part II.C of the court's opinion, which concludes that the Colindreses' unconstitutional vagueness and equal protection challenges are not properly before us. And I join the portion of Part II.B of the opinion that rejects the Colindreses' claim that the government acted in bad faith in denying Mr. Colindres Juarez a visa. *See* Maj. Op. 12. Respectfully, however, I do not join the remainder of Part II.B or Part II.A of the court's opinion, which address the Colindreses' procedural due process challenge.

In Part II.A, my colleagues hold that a person's fundamental constitutional right to marriage does not include any protected liberty interest in living in the United States with her spouse. And because there is no protected interest to which due process protections apply, there is no need to apply any due process scrutiny, even a relaxed form of review. On that view, the government could deny an American citizen's spouse a visa to reenter the country—thus depriving the citizen of the company of her spouse in the country ever again—without any explanation and for a wholly arbitrary reason, and that result would not implicate the fundamental right to marriage so as to trigger due process scrutiny. To be sure, as my colleagues note, our court issued a decision 65 years ago holding that the deportation of a citizen's spouse did not violate the citizen's right to marriage. *Swartz v. Rogers*, 254 F.2d 338, 339 (D.C. Cir. 1958). But insofar as that decision rested on the notion that the right to marriage does not include any protected interest in living in the country with one's spouse, we have had no occasion to reassess the issue afresh in the intervening decades.

The Supreme Court has since "acknowledged," though, that when a foreign scholar is denied admission into the country to speak at a conference, an American professor's constitutional "right to receive information" is "implicated,"

such that some form of constitutional scrutiny applies. *Trump v. Hawaii*, 138 S. Ct. 2392, 2419 (2018) (quotation marks omitted) (quoting and discussing *Kleindienst v. Mandel*, 408 U.S. 753, 764–65 (1972)). (To the extent my colleagues mean to question whether any scrutiny in fact applies on those facts, i.e., the facts of *Mandel* (Maj. Op. 10 n.2), I understand *Trump v. Hawaii* to confirm that "limited" scrutiny does apply in that situation, 138 S. Ct. at 2419—after all, presumably *some* manner of constitutional scrutiny applies when a constitutional right is "implicated," *id.*) In the Court's view, American professors have a cognizable right-to-information interest in a foreign scholar's "physical presence" in the country to enable "sustained, face-to-face" interaction with the scholar. *Mandel*, 408 U.S. at 765. My colleagues conclude today, however, that an American citizen has no cognizable right-to-marriage interest in her husband's physical presence in the country to enable sustained, face-to-face interaction with her husband. The upshot is that, whereas the denial of a visa to a foreign scholar triggers at least some due process scrutiny because of an American scholar's right to receive information, the denial of a visa to a foreign spouse triggers no due process scrutiny at all despite the American spouse's right to marriage.

Notably, when the Supreme Court recently considered the same issue in *Kerry v. Din*, 576 U.S. 86 (2015), a majority of the Court either assumed or concluded that the right to marriage includes a protected interest in living with one's spouse in the country. *Id.* at 102 (Kennedy, J., joined by Alito, J., concurring in the judgment); *id.* at 107–10 (Breyer, J., joined by Ginsburg, Sotomayor & Kagan, JJ., dissenting). In deciding to the contrary, my colleagues rely on the plurality opinion in *Din* joined by three Justices. *See id.* at 88–101 (plurality opinion). But the remaining six Justices expressly declined to join the plurality's resolution of the issue. *Id.* at 102 (Kennedy, J., concurring in the judgment); *id.* at 107 (Breyer, J., dissenting).

And in fact, of the Justices who reached the merits of the question, more concluded that an American citizen possesses a cognizable liberty interest in her spouse's physical presence in the country than concluded otherwise. *Compare id.* at 107 (Breyer, J., dissenting), *with id.* at 88 (plurality opinion). The issue then remains an unsettled one in the Supreme Court.

There is no need for us to take up the merits of that constitutional question anew in this case, and I would refrain from doing so. Rather, we can rest our decision solely on the ground my colleagues address in Part II.B of the court's opinion—i.e., that even assuming Mrs. Colindres's fundamental right to marriage includes a protected interest in living in the country with her husband, such that at least some form of due process scrutiny applies, the government's denial of a visa to him afforded her adequate process. That is precisely how the controlling opinion in *Din* resolved that case. *Id.* at 102 (Kennedy, J., concurring in the judgment). I would follow the same course here.

That brings me to Part II.B of the court's opinion. While I agree with my colleagues' conclusion in that Part that the government provided whatever process may have been due in this case, my route for reaching that conclusion differs in part. As my colleagues explain (Maj. Op. 10), the question is whether the government gave "a facially legitimate and bona fide reason" for denying Mr. Colindres Juarez a visa. *Mandel*, 408 U.S. at 770; *see Din*, 576 U.S. at 103–04 (Kennedy, J., concurring in the judgment). The government's citation of an applicable admissibility statute as its basis for denying a visa establishes that the reason for its denial is "facially legitimate," as it "show[s] that the denial rested on a determination that [the applicant] did not satisfy the statute's requirements." *Din*, 576 U.S. at 104–05 (Kennedy, J., concurring in the judgment). Such a statutory reference can also show that the government

"relied upon a bona fide" reason, if the statute "specifies discrete factual predicates the consular officer must find to exist before denying a visa." *Id.* at 105.

In the event the statute speaks in sufficiently broad terms that it does not itself "specif[y] discrete factual predicates" for denying a visa, the government can still satisfy due process by "disclos[ing] the facts motivating [its] decision to deny" the visa under the statute. *Id.* In *Mandel*, for instance, the relevant statute was framed in highly general terms that "granted the Attorney General nearly unbridled discretion," but the government's disclosure of the underlying "facts motivating [its] decision" under the statute—viz., "Mandel's abuse of past visas"—satisfied due process. *Id.* at 103, 105. Disclosure of such facts shows a "bona fide" basis for denying a visa by conveying why the government believes a broadly framed statute applies in a particular case. *See id.* at 105.

In this case, the statute under which the government denied Mr. Colindres Juarez a visa is 8 U.S.C. § 1182(a)(3)(A)(ii), which renders inadmissible "[a]ny alien who a consular officer or the Attorney General knows, or has reasonable ground to believe, seeks to enter the United States to engage solely, principally, or incidentally in . . . unlawful activity." My colleagues believe that statute specifies a sufficiently discrete factual predicate such that citation of that statute alone is enough to satisfy due process. The Ninth Circuit has held to the contrary, concluding that, when the government denies a visa under that provision, it must disclose a more discrete factual predicate conveying why the government believes the statute applies in the specific case. *See Muñoz v. U.S. Dep't of State*, 50 F.4th 906, 917–18 & n.27 (9th Cir. 2022).

I might well side with my colleagues if it were necessary to decide the issue, but we generally "avoid creating circuit

splits when possible." *United States v. Philip Morris USA Inc.*, 396 F.3d 1190, 1201 (D.C. Cir. 2005). And here, the government did more than just cite section 1182(a)(3)(A)(ii) in explaining the basis for its visa denial. It also related why it was denying a visa under that section: because it had "reason to believe [Mr. Colindres Juarez] is a member of a known criminal organization." Compl. ¶ 37, J.A. 242–43. Under *Din* and *Mandel*, disclosure of that discrete factual predicate, together with citing the statute, shows a bona fide basis for the denial so as to satisfy due process. I would affirm the dismissal of the Colindreses' due process claim on that ground.