## *PRELIMINARY PRINT*

## VOLUME 602 U. S. PART 1

### PAGES 899–942

# OFFICIAL REPORTS

OF

# THE SUPREME COURT

JUNE 21, 2024

Page Proof Pending Publication

REBECCA A. WOMELDORF

REPORTER OF DECISIONS



NOTICE: This preliminary print is subject to formal revision before the bound volume is published. Users are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D.C. 20543, pio@supremecourt.gov, of any typographical or other formal errors.

# DEPARTMENT OF STATE ET AL. *v.* MUÑOZ ET AL.

## CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

No. 23–334.   Argued April 23, 2024—Decided June 21, 2024

Respondent Sandra Muñoz is an American citizen.   In 2010, she married Luis Asencio-Cordero, a citizen of El Salvador.   The couple eventually sought to obtain an immigrant visa for Asencio-Cordero so that they could live together in the United States.   Muñoz filed a petition with U. S. Citizenship and Immigration Services to have Asencio-Cordero classified as an immediate relative.   See 8 U. S. C. §§ 1151(b)(2)(A)(i), 1154(a)(1)(A).   USCIS granted Muñoz's petition, and Asencio-Cordero traveled to the consulate in San Salvador to apply for a visa.   See §§ 1154(b), 1202.   After conducting several interviews with Asencio-Cordero, a consular officer denied his application, citing § 1182(a)(3)(A)(ii), a provision that renders inadmissible a noncitizen whom the officer "knows, or has reasonable ground to believe, seeks to enter the United States to engage solely, principally, or incidentally in" certain specified offenses or "any other unlawful activity."

Asencio-Cordero guessed that he was denied a visa based on a finding that he was a member of MS–13, a transnational criminal gang.   So he disavowed any gang membership, and he and Muñoz pressed the consulate to reconsider the officer's finding.   When the consulate refused, they appealed to the Department of State, which agreed with the consulate's determination.   Asencio-Cordero and Muñoz then sued the Department of State and others (collectively, State Department), claiming that it had abridged Muñoz's constitutional liberty interest in her husband's visa application by failing to give a sufficient reason why Asencio-Cordero is inadmissible under the "unlawful activity" bar.   The District Court granted summary judgment to the State Department, but the Ninth Circuit vacated the judgment, holding that Muñoz had a constitutionally protected liberty interest in her husband's visa application.   Because of that interest, the court said, the Due Process Clause required the State Department to give Muñoz a reason for denying her husband's visa. The court further held that by declining to give Muñoz more information earlier in the process, the State Department had forfeited its entitlement to insulate its decision from judicial review under the doctrine of consular nonreviewability.

*Held*: A citizen does not have a fundamental liberty interest in her noncitizen spouse being admitted to the country.   Pp. 907–919.

Syllabus

(a) Under the doctrine of consular nonreviewability, an executive officer's decision "to admit or to exclude an alien" "is final and conclusive," *United States ex rel. Knauff* v. *Shaughnessy*, 338 U. S. 537, 543, and not subject to judicial review in federal court. This Court has assumed a narrow exception in cases "when the denial of a visa allegedly burdens the constitutional rights of a U. S. citizen." *Trump* v. *Hawaii*, 585 U. S. 667, 703. In that event, the Court has considered whether the executive official gave a "facially legitimate and bona fide reason" for denying the visa. *Kerry* v. *Din*, 576 U. S. 86, 103–104.

Asencio-Cordero cannot invoke the exception himself, thus Muñoz must assert that the denial of her husband's visa violated *her* constitutional rights, thereby enabling judicial review. She argues that the State Department abridged her fundamental right to live with her spouse in her country of citizenship without affording her due process. Pp. 907–908.

(b) Among other things, the Due Process Clause "provides heightened protection against government interference with certain fundamental rights and liberty interests." *Washington* v. *Glucksberg*, 521 U. S. 702, 720. When a fundamental right is at stake, the government can act only by narrowly tailored means that serve a compelling state interest. To identify an unenumerated right, the Court follows the two-step inquiry in *Glucksberg*. That inquiry first insists on a "careful description of the asserted fundamental liberty interest." *Id.*, at 721 (internal quotation marks omitted). Second, the inquiry stresses that "the Due Process Clause specially protects" only "those fundamental rights and liberties which are, objectively, deeply rooted in this Nation's history and tradition." *Id.*, at 720–721 (same).

Here, Muñoz invokes the "fundamental right to marriage," but she actually claims something more distinct: the right to *reside with her noncitizen spouse in the United States*. That involves more than marriage and more than spousal cohabitation—it includes the right to have her noncitizen husband enter (and remain in) the United States. As Muñoz asserts it, she claims a "marital right . . . sufficiently important that it cannot be unduly burdened without procedural due process as to an inadmissibility finding that would block her from residing with her spouse in her country of citizenship." Brief for Respondents 19, n. 10. So described, the asserted right is fundamental enough to be implicit in "liberty;" but, unlike other implied fundamental rights, its deprivation does not trigger strict scrutiny.

Because Muñoz cannot clear the second step of *Glucksberg*, the Court need not decide whether such a category of implied rights protected by the Due Process Clause exists. *Glucksberg* requires a demonstration that the asserted right be "deeply rooted in this Nation's history and

tradition." 521 U. S., at 721. This Nation's history and tradition recognizes the Government's sovereign authority to set the terms governing the admission and exclusion of noncitizens, and Muñoz points to no subsidiary tradition that curbs this authority in the case of noncitizen spouses.

From this Nation's beginnings, the admission of noncitizens into the country was characterized as "of favor [and] not of right." J. Madison, Report of 1800. And when Congress began to restrict immigration in the late 19th century, the laws it enacted provided no exceptions for citizens' spouses. See, *e. g.*, Page Act of 1875, 18 Stat. 477–478; Immigration Act of 1882, 22 Stat. 214; Immigration Act of 1891, 26 Stat. 1084. And while Congress has, on occasion, extended special immigration treatment to marriage, see, *e. g.*, War Brides Act of 1945, 59 Stat. 659, it has never made spousal immigration a matter of *right*.

This Court has not interfered with such policy choices, despite their interference with the spousal relationship. Thus in *United States ex rel. Knauff* v. *Shaughnessy*, 338 U. S. 537, the Court reaffirmed, in the case of a noncitizen spouse who was denied admission for confidential security reasons, the longstanding principle "that the United States can, as a matter of public policy . . . forbid aliens or classes of aliens from coming within [its] borders," and "[n]o limits can be put by the courts upon" that power. *Wong Wing* v. *United States*, 163 U. S. 228, 237. Pp. 909–916.

(c) Muñoz's claim to a procedural due process right in *someone else's* legal proceeding would have unsettling collateral consequences. Her position would usher in a new strain of constitutional law—one that prevents the government from taking actions that "indirectly or incidentally" burden a citizen's legal rights. *Castle Rock* v. *Gonzales*, 545 U. S. 748, 767. See, *e. g.*, *O'Bannon* v. *Town Court Nursing Center*, 447 U. S. 773, 788. To be sure, Muñoz has suffered harm from the denial of Asencio-Cordero's visa application, but that harm does not give her a constitutional right to participate in his consular proceeding. Pp. 916–919.

50 F. 4th 906, reversed and remanded.

BARRETT, J., delivered the opinion of the Court, in which ROBERTS, C. J., and THOMAS, ALITO, and KAVANAUGH, JJ., joined. GORSUCH, J., filed an opinion concurring in the judgment, *post*, p. 919. SOTOMAYOR, J., filed a dissenting opinion, in which KAGAN and JACKSON, JJ., joined, *post*, p. 920.

*Deputy Solicitor General Gannon* argued the cause for petitioners. With him on the briefs were *Solicitor General*

Opinion of the Court

*Prelogar, Principal Deputy Assistant Attorney General Boynton, Caroline A. Flynn, William C. Silvis, Aaron S. Goldsmith,* and *Joshua S. Press.*

*Eric Lee* argued the cause for respondents. With him on the brief were *Alan Diamante, Charles Roth, Keren Zwick, Mary Georgevich,* and *Erwin Chemerinsky.\**

JUSTICE BARRETT delivered the opinion of the Court.

Luis Asencio-Cordero seeks to enter the United States to live with Sandra Muñoz, his wife. To obtain the necessary visa, he submitted an application at the United States consulate in San Salvador. A consular officer denied his application, however, after finding that Asencio-Cordero is affiliated with MS–13, a transnational criminal gang. Because of national security concerns, the consular officer did not disclose the basis for his decision. And because Asencio-Cordero, as a noncitizen, has no constitutional right to enter the United States, he cannot elicit that information or challenge the denial of his visa.

---

*\*Christopher J. Hajec* filed a brief for the Immigration Reform Law Institute as *amicus curiae* urging reversal.

Briefs of *amici curiae* urging affirmance were filed for the American Civil Liberties Union et al. by *Daniel A. Galindo, Omar C. Jadwat, Judy Rabinovitz, Lee Gelernt, Cecillia D. Wang, Cody Wofsy,* and *David D. Cole*; for the American Immigration Lawyers Association et al. by *Charles A. Rothfeld* and *Eugene R. Fidell*; for Former Consular Officers by *Matthew E. Price*; for Former Department of Homeland Security Officials by *Jeffrey S. Ginsberg*; for the Fred T. Korematsu Center for Law and Equality et al. by *Corey Stoughton, Robert S. Chang, Niyati Shah,* and *Noah Baron*; for HIAS Inc. by *Benjamin G. Shatz*; for the International Refugee Assistance Project et al. by *Melissa S. Keaney* and *Mariko Hirose*; for the Migrant Rights Initiative et al. by *Ian M. Kysel*; for Professors and Scholars by *Nadia Anguiano*; for Public Citizen by *Lauren E. Bateman* and *Allison M. Zieve*; for the United States Conference of Catholic Bishops et al. by *Amer S. Ahmed* and *Richard W. Mark*; and for 35 Members of Congress by *Erin Marie Meyer.*

Briefs of *amici curiae* were filed for the American Bar Association by *Mary Smith, Robert N. Hochman,* and *Kelly J. Huggins*; for the HEAL Refugee Health and Asylum Collaborative by *David M. Zionts*; and for Immigration Law and History Scholars by *Deanna M. Rice.*

Opinion of the Court

Muñoz, on the other hand, is a citizen, and she filed her own challenge to the consular officer's decision.   She reasons as follows: The right to live with her noncitizen spouse in the United States is implicit in the "liberty" protected by the Fifth Amendment; the denial of her husband's visa deprived her of this interest, thereby triggering her right to due process; the consular officer violated her right to due process by declining to disclose the basis for finding Asencio-Cordero inadmissible; and this, in turn, enables judicial review, even though visa denials are ordinarily unreviewable by courts.

Muñoz's argument fails at the threshold.   Her argument is built on the premise that the right to bring her noncitizen spouse to the United States is an unenumerated constitutional right.   To establish this premise, she must show that the asserted right is " 'deeply rooted in this Nation's history and tradition.' "   *Washington* v. *Glucksberg*, 521 U. S. 702, 720–721 (1997).   She cannot make that showing.   In fact, Congress's longstanding regulation of spousal immigration—including through bars on admissibility—cuts the other way.

I

A

To be admitted to the United States, a noncitizen typically needs a visa.   66 Stat. 181, 8 U. S. C. §1181(a).   Visa decisions are made by the political branches.   *Trump* v. *Hawaii*, 585 U. S. 667, 702–703 (2018); see also *Oceanic Steam Nav. Co.* v. *Stranahan*, 214 U. S. 320, 339 (1909) (explaining that "over no conceivable subject is the legislative power of Congress more complete").   As a general matter, Congress sets the terms for entry, and the Department of State implements those requirements at United States Embassies and consulates in foreign countries.[1]

_____

[1] We describe the process for noncitizens who, like Asencio-Cordero, have not yet been lawfully admitted to the United States and must therefore apply from abroad.   Compare 8 U. S. C. §1255(a) (adjustment of status to lawful permanent resident for noncitizens already admitted into the United States) with 22 CFR §§42.61, 42.62 (2023) (noncitizens applying for

Congress has streamlined the visa process for noncitizens with immediate relatives in the United States. The citizen-relative must first file a petition with U. S. Citizenship and Immigration Services (USCIS), an agency housed within the Department of Homeland Security, to have the noncitizen classified as an immediate relative. See *Scialabba* v. *Cuellar de Osorio*, 573 U. S. 41, 46–47 (2014) (plurality opinion); §§ 1151(b)(2)(A)(i), 1154(a)(1)(A). If USCIS approves the petition, then the noncitizen may apply for a visa. §§ 1201(a), 1202(a). As part of this process, the noncitizen submits written materials and interviews with a consular officer abroad. §§ 1201(a)(1), 1202.

Ordinarily, a consular officer who denies a visa application "because the officer determines the alien to be inadmissible" must "provide the alien with a timely written notice that . . . (A) states the determination, and (B) lists the specific provision or provisions of law under which the alien is inadmissible." § 1182(b)(1). The statute requires no explanation, however, "to any alien inadmissible" on certain grounds related to crime and national security. § 1182(b)(3). This case involves a noncitizen to whom this statutory exception applies.

B

Sandra Muñoz, an American citizen, married Luis Asencio-Cordero, a Salvadoran citizen, in 2010. Several years later, the couple began taking steps to obtain an immigrant visa for Asencio-Cordero. Muñoz filed a petition to classify her husband as an immediate relative, which USCIS granted. §§ 1151(b)(2)(A)(i), 1154(a)(1)(A). Because Asencio-Cordero had entered the United States unlawfully, he was required to return to El Salvador and submit his visa application at a consulate there. See §§ 1154(b), 1202; 22 CFR § 42. He met

immigrant visa must appear in person before consular officer in consular district of residence).

Opinion of the Court

with a consular officer in San Salvador and underwent several interviews.

In December 2015, the officer denied Asencio-Cordero's application, citing 8 U. S. C. § 1182(a)(3)(A)(ii). That provision renders inadmissible a noncitizen whom the officer "knows, or has reasonable ground to believe, seeks to enter the United States to engage solely, principally, or incidentally in" certain specified offenses or "any other unlawful activity." *Ibid.* The officer provided no additional details—but, given the reason for the visa denial, even the statutory citation was more information than Asencio-Cordero was entitled to receive. § 1182(b)(3).

Asencio-Cordero guessed (as it turns out, accurately) that he was denied a visa based on a finding that he was a member of MS–13, a transnational criminal gang. He also guessed (again, accurately) that this finding was based at least in part on the conclusion that his tattoos signified gang membership. Asencio-Cordero and Muñoz denied that Asencio-Cordero was affiliated with MS–13 or any other gang, and they pressed the consulate to reconsider the officer's finding. When the consulate held firm, they appealed to the Department of State, submitting evidence that the tattoos were innocent. A Department official informed Asencio-Cordero and Muñoz that the Department agreed with the consulate's determination. The next day, the consul in San Salvador notified them that Asencio-Cordero's application had gone through multiple rounds of review—including by the consular officer, consular supervisors, the consul himself, the Bureau of Consular Affairs, and the State Department's Immigration Visa Unit—and none of these reviews had "'revealed any grounds to change the finding of inadmissibilty.'" App. 7.

Asencio-Cordero and Muñoz sued the Department of State, the Secretary of State, and the United States consul in San Salvador. (For simplicity's sake, we will refer to the

defendants collectively as the State Department.) They alleged, among other things, that the State Department had abridged Muñoz's constitutional liberty interest in her husband's visa application by failing to give a sufficient reason why Asencio-Cordero is inadmissible under the "unlawful activity" bar.

The District Court agreed and ordered discovery. In a sworn declaration, an attorney adviser from the State Department explained that Asencio-Cordero was deemed inadmissible because he belonged to MS–13. The finding was "based on the in-person interview, a criminal review of . . . Asencio[-]Cordero, and a review of [his] tattoos." App. to Pet. for Cert. 124a. In addition to the affidavit, the State Department provided the District Court with confidential law enforcement information, which it reviewed *in camera*, identifying Ascencio-Cordero as a member of MS–13. Satisfied, the District Court granted summary judgment to the State Department.

The Ninth Circuit vacated the judgment and remanded the case. Consistent with circuit precedent, it held that Muñoz, as a citizen, had a constitutionally protected liberty interest in her husband's visa application. Because of that interest, the Ninth Circuit said, the Due Process Clause required the State Department to give Muñoz a " 'facially legitimate and bona fide reason' " for denying her husband's visa. 50 F. 4th 906, 916 (2022) (quoting *Kleindienst* v. *Mandel*, 408 U. S. 753, 766–770 (1972)). The initial statutory citation did not qualify, 50 F. 4th, at 917–918, and the later affidavit was untimely, *id.*, at 921–922. Delay carried a serious consequence for the State Department. Visa denials are insulated from judicial review by the doctrine of consular nonreviewability. But the Ninth Circuit held that by declining to give Muñoz more information earlier in the process, the State Department had forfeited its entitlement "to shield its visa decision from judicial review." *Id.*, at 924. The panel remanded for the District Court to consider the merits of Muñoz's suit, which in-

clude a request for a declaration invalidating the finding that Asencio-Cordero is inadmissible and an order demanding that the State Department readjudicate Asencio-Cordero's application.[2]

The Ninth Circuit denied en banc review over the dissent of 10 judges, and we granted the State Department's petition for certiorari.   601 U. S. —— (2024).[3]

## II

"For more than a century, this Court has recognized that the admission and exclusion of foreign nationals is a 'fundamental sovereign attribute exercised by the Government's political departments largely immune from judicial control.'" *Trump*, 585 U. S., at 702 (quoting *Fiallo* v. *Bell*, 430 U. S. 787, 792 (1977)).   Congress may delegate to executive officials the discretionary authority to admit noncitizens "immune from judicial inquiry or interference."   *Harisiades* v.

_____

[2] At oral argument in this Court, Muñoz suggested that she is asserting a constitutional entitlement only to information—a "facially legitimate and bona fide reason" why the consular officer deemed her husband inadmissible under the "unlawful activity" bar.   Tr. of Oral Arg. 59–64.   Elsewhere, though, she suggests that the Due Process Clause entitles her to both the information and "a meaningful opportunity to respond."   Brief for Respondents 11.   If appeal is no longer available under State Department regulations (and the Ninth Circuit said it was not), Muñoz presumably seeks what she sought below: judicial review of the inadmissibility finding and a court order requiring the State Department to reconsider Asencio-Cordero's visa application.   50 F. 4th, at 912, n. 14.   This level of judicial involvement in the visa process would be a significant extension of our precedent.   The dissent, however, would remand to the Ninth Circuit for consideration of this relief.   *Post*, at 930, n. 3 (opinion of SOTOMAYOR, J.).

[3] Inexplicably, the dissent claims that the Court is reaching out improperly to settle this issue.   *Post*, at 921.   We granted certiorari on this very question to resolve a longstanding circuit split.   601 U. S. —— (2024). And we did so at the request of the Solicitor General, who emphasized both the Government's need for uniformity in the administration of immigration law and the importance of this issue to national security.   Pet. for Cert. 27–28, 31–33.

*Shaughnessy*, 342 U. S. 580, 588–591 (1952). When it does so, the action of an executive officer "to admit or to exclude an alien" "is final and conclusive." *United States ex rel. Knauff* v. *Shaughnessy*, 338 U. S. 537, 543 (1950); see also *Dept. of Homeland Security* v. *Thuraissigiam*, 591 U. S. 103, 138–139 (2020); *Mandel*, 408 U. S., at 765–766; *Nishimura Ekiu* v. *United States*, 142 U. S. 651, 659–660 (1892). The Judicial Branch has no role to play "unless expressly authorized by law." *Knauff*, 338 U. S., at 543. The Immigration and Nationality Act (INA) does not authorize judicial review of a consular officer's denial of a visa; thus, as a rule, the federal courts cannot review those decisions.[4] This principle is known as the doctrine of consular nonreviewability.

We have assumed that a narrow exception to this bar exists "when the denial of a visa allegedly burdens the constitutional rights of a U. S. citizen." *Trump*, 585 U. S., at 703. In that event, the Court has considered whether the Executive gave a "'facially legitimate and bona fide reason'" for denying the visa. *Kerry* v. *Din*, 576 U. S. 86, 103–104 (2015) (Kennedy, J., concurring in judgment) (quoting *Mandel*, 408 U. S., at 770). If so, the inquiry is at an end—the Court has disclaimed the authority to "'look behind the exercise of that discretion,'" much less to balance the reason given against the asserted constitutional right. *Din*, 576 U. S., at 104.

Asencio-Cordero cannot invoke the exception himself, because he has no "constitutional right of entry to this country as a nonimmigrant or otherwise." *Mandel*, 408 U. S., at 762. Thus, so far as Asencio-Cordero is concerned, the doctrine of consular nonreviewability applies. Muñoz, however, is an

---

[4] In *Trump* v. *Hawaii*, the plaintiffs argued that a proclamation excluding certain classes of noncitizens from entering the United States exceeded the President's authority under the Immigration and Nationality Act. 585 U. S. 667, 681–682 (2018). The Court explained that the doctrine of consular nonreviewability is not jurisdictional and "assume[d] without deciding that [the] plaintiffs' statutory claims [were] reviewable." *Id.*, at 682–683.

American citizen, and she asserts that the denial of her husband's visa violated *her* constitutional rights, thereby enabling judicial review. Specifically, she argues that the State Department abridged her fundamental right to live with her spouse in her country of citizenship—and that it did so without affording her the fair procedure guaranteed by the Fifth Amendment.

The Ninth Circuit is the only Court of Appeals to have embraced this asserted right—every other Circuit to consider the issue has rejected it.[5] See *Colindres* v. *U. S. Dept. of State*, 71 F. 4th 1018, 1021 (CADC 2023); *Baaghil* v. *Miller*, 1 F. 4th 427, 433 (CA6 2021); *Bakran* v. *Secretary, U. S. Dept. of Homeland Security*, 894 F. 3d 557, 564 (CA3 2018); *Bright* v. *Parra*, 919 F. 2d 31, 34 (CA5 1990) (*per curiam*); *Burrafato* v. *U. S. Dept. of State*, 523 F. 2d 554, 554–557 (CA2 1975); *Silverman* v. *Rogers*, 437 F. 2d 102, 107 (CA1 1970). In *Din*, this Court considered but did not resolve the question. A plurality concluded that a citizen does not have a fundamental right to bring her noncitizen spouse to the United States. 576 U. S., at 96. Two Justices chose not to reach the issue, explaining that even if the right existed, the statutory citation provided by the Executive qualified as a facially legitimate and bona fide reason. *Id.*, at 105 (opinion of Kennedy, J.). Since *Din*, the existence of the right has continued to divide the Circuits.

Today, we resolve the open question. Like the *Din* plurality, we hold that a citizen does not have a fundamental liberty interest in her noncitizen spouse being admitted to the country.

## III

The Due Process Clause of the Fifth Amendment requires the Government to provide due process of law before it de-

---

[5] The dissent characterizes our decision today as extreme, *post*, at 933–934, but it is the dissent who embraces the outlier position: Our opinion is in line with the vast majority of Circuits that have decided this question. The dissent aligns itself with the lone Circuit going the other way.

prives someone of "life, liberty, or property." Under our precedent, the Clause promises more than fair process: It also "provides heightened protection against government interference with certain fundamental rights and liberty interests." *Glucksberg*, 521 U. S., at 720. When a fundamental right is at stake, the Government can act only by narrowly tailored means that serve a compelling state interest. *Id.*, at 721. Identifying unenumerated rights carries a serious risk of judicial overreach, so this Court "exercise[s] the utmost care whenever we are asked to break new ground in this field." *Id.*, at 720 (internal quotation marks omitted). To that end, *Glucksberg*'s two-step inquiry disciplines the substantive due process analysis. First, it insists on a "careful description of the asserted fundamental liberty interest." *Id.*, at 721 (internal quotation marks omitted). Second, it stresses that "the Due Process Clause specially protects" only "those fundamental rights and liberties which are, objectively, deeply rooted in this Nation's history and tradition." *Id.*, at 720–721 (internal quotation marks omitted).

We start with a "careful description of the asserted fundamental liberty interest." *Id.*, at 721 (internal quotation marks omitted). Muñoz invokes the "fundamental right of marriage," but the State Department does not deny that Muñoz (who is already married) has a fundamental right to marriage. Muñoz claims something distinct: the right to *reside with her noncitizen spouse in the United States*. That involves more than marriage and more than spousal cohabitation—it includes the right to have her noncitizen husband enter (and remain in) the United States.

It is difficult to pin down the nature of the right Muñoz claims. The logic of her position suggests an entitlement to bring Asencio-Cordero to the United States—how else could Muñoz enjoy the asserted right to live with her noncitizen husband in her country of citizenship? See also Brief for Petitioners 23, n. 8 (characterizing Muñoz's claim as an "entitle[ment] to the visa itself"). Yet Muñoz disclaims that

characterization, insisting that "[she] does not advance a substantive right to immigrate one's spouse." Brief for Respondents 19, n. 10. This concession is wise, because such a claim would ordinarily trigger strict scrutiny—and it would be remarkable to put the Government to the most demanding test in constitutional law in the field of immigration, an area unsuited to rigorous judicial oversight. *Fiallo*, 430 U. S., at 792 ("Our cases 'have long recognized the power to expel or exclude aliens as a fundamental sovereign attribute exercised by the Government's political departments largely immune from judicial control' ").

Though understandable, Muñoz's concession makes characterizing the asserted right a conceptually harder task. Here is her formulation: a "marital right . . . sufficiently important that it cannot be unduly burdened without procedural due process as to an inadmissibility finding that would block her from residing with her spouse in her country of citizenship." Brief for Respondents 19, n. 10. So described, the asserted right is neither fish nor fowl. It is fundamental enough to be implicit in "liberty;" but, unlike other implied fundamental rights, its deprivation does not trigger strict scrutiny. See *Din*, 576 U. S., at 99 (plurality opinion) (observing that this argument posits "two categories of implied rights protected by the Due Process Clause: really fundamental rights, which cannot be taken away at all absent a compelling state interest; and not-so-fundamental rights, which can be taken away so long as procedural due process is observed"). This right would be in a category of one: a substantive due process right that gets only procedural due process protection. *Ibid.*

We need not decide whether such a category exists, because Muñoz cannot clear the second step of *Glucksberg*'s test: demonstrating that the right to bring a noncitizen spouse to the United States is " 'deeply rooted in this Nation's history and tradition.' " 521 U. S., at 721. On the contrary, the through line of history is recognition of the

Government's sovereign authority to set the terms governing the admission and exclusion of noncitizens. And Muñoz points to no subsidiary tradition that curbs this authority in the case of noncitizen spouses.

From the beginning, the admission of noncitizens into the country was characterized as "of favor [and] *not of right*." J. Madison, Report of 1800 (Jan. 7, 1800), in 17 Papers of James Madison 319 (D. Mattern, J. Stagg, J. Cross, & S. Perdue eds. 1991) (emphasis added); see also 2 Records of the Federal Convention of 1787, p. 238 (M. Farrand ed. 1911) (recounting Gouverneur Morris's observation that "every Society from a great nation down to a club ha[s] the right of declaring the conditions on which new members should be admitted"); Debate on Virginia Resolutions, in The Virginia Report of 1799–1800, p. 31 (1850) (reprint 2005) ("[B]y the law of nations, it is left in the power of all states to take such measures about the admission of strangers as they think convenient"). Consistent with this view, the 1798 Act Concerning Aliens gave the President complete discretion to remove "all such aliens as he shall judge dangerous to the peace and safety of the United States." 1 Stat. 571 (emphasis deleted). The Act made no exception for spouses—or, for that matter, other family members.

The United States had relatively open borders until the late 19th century. But once Congress began to restrict immigration, "it enacted a complicated web of regulations that erected serious impediments to a person's ability to bring a spouse into the United States." *Din*, 576 U. S., at 96 (plurality opinion). One of the first federal immigration statutes, the Immigration Act of 1882, required executive officials to "examine" noncitizens and deny "permi[ssion] to land" to "any convict, lunatic, idiot, or any person unable to take care of himself or herself without becoming a public charge." 22 Stat. 214. The Act provided no exception for citizens' spouses. And when Congress drafted a successor statute that expanded the grounds of inadmissibility, it again gave

no special treatment to the marital relationship. Immigration Act of 1891, ch. 551, 26 Stat. 1084.

There are other examples. The Page Act of 1875, which functioned as a restriction on Chinese female immigration, contained no exception for wives. 18 Stat. 477–478; see *Colindres*, 71 F. 4th, at 1023. Or consider the Emergency Quota Act of 1921, which capped the number of immigrants permitted to enter the country each year. 42 Stat. 5–6. Although the Act gave preferential treatment to citizens' wives, "once all the quota spots were filled for the year, the spouse was barred without exception." *Din*, 576 U. S., at 97 (plurality opinion).[6] See also C. Bredbenner, A Nationality of Her Own: Women, Marriage, and the Law of Citizenship 115 (1998) ("[C]itizens' wives were still quota immigrants, and immigration officials could regulate their entry closely if economic or other circumstances prompted a general tightening of admissio[n]"). In 1924, Congress, showing favor to men rather than marriage, lifted the quotas for male citizens with noncitizen wives, but did not similarly clear the way for female citizens with noncitizen husbands. Abrams 12. This gender disparity did not change until 1952. *Id.*, at 13–14.

That is not to say that Congress has not extended special treatment to marriage—it has. For instance, the War Brides Act of 1945 provided that the noncitizen spouses of World War II veterans would be exempt from certain admissibility bars and documentary requirements. Ch. 591, 59 Stat. 659. Closer to home, Asencio-Cordero's visa applica-

―――――――

[6] Given the then-existing law of coverture, the Act was only relevant to noncitizen wives—a citizen wife with a noncitizen husband was forced to assume her husband's nationality. K. Abrams, What Makes the Family Special? 80 U. Chi. L. Rev. 7, 11 (2013) (Abrams) ("Giving wives the opportunity to sponsor their husbands would have been nonsensical; under the Expatriation Act of 1907, a wife automatically *lost* her US citizenship upon marrying a foreigner, so there could be no such thing as a US citizen wife with an immigrant husband" (footnotes omitted)). This changed in 1922, when the Cable Act "largely undid derivative citizenship for married women." *Ibid.*

tion rested on his marriage to Muñoz, which made him eligible for immigrant status. §1154. But while Congress has made it easier for spouses to immigrate, it has never made spousal immigration a matter of right. On the contrary, qualifications and restrictions have long been the norm. See, *e. g.*, Act of Aug. 9, 1946, ch. 945, 60 Stat. 975 (granting nonquota status to Chinese wives of American citizens, but only for those with longstanding marriages).

Of particular relevance to Muñoz, Congress has not exempted spouses from inadmissibility restrictions like the INA's unlawful-activity bar. Precursors to that bar have existed since the early 20th century. For example, the Immigration Act of 1917 provided for the exclusion of "persons who have been convicted of or admit having committed a felony or other crime or misdemeanor involving moral turpitude." Ch. 29, 39 Stat. 875. Consular officers applied this bar to spouses, and courts refused to review those visa denials, citing the doctrine of consular nonreviewability. See, *e. g.*, *United States ex rel. Ulrich* v. *Kellogg*, 30 F. 2d 984, 985–986 (CADC 1929).

*United States ex rel. Knauff* v. *Shaughnessy* is a striking example from this Court. In *Knauff*, a United States citizen (and World War II veteran) found himself similarly situated to Muñoz: His noncitizen wife was denied admission for security reasons, based on "information of a confidential nature, the disclosure of which would be prejudicial to the public interest." 338 U. S., at 541, 544. We held that the War Brides Act did not supersede the statute on which the Attorney General had relied. *Id.*, at 546–547 ("There is nothing in the War Brides Act . . . to indicate that it was the purpose of Congress, by partially suspending compliance with certain requirements and the quota provisions of the immigration laws, to relax the security provisions of the immigration laws"). So, "[a]s all other aliens, petitioner had to stand the test of security." *Id.*, at 547. Nor was she entitled to a hearing, because "[w]hatever the procedure authorized by Congress

is, it is due process as far as an alien denied entry is concerned." *Id.*, at 544. The Attorney General's decision was "final and conclusive," and he did not have to divulge the reason for it. *Id.*, at 543.[7]

*Knauff* thus reaffirmed the longstanding principle "that the United States can, as a matter of public policy . . . forbid aliens or classes of aliens from coming within their borders," and "[n]o limits can be put by the courts upon" that power. *Wong Wing* v. *United States*, 163 U. S. 228, 237 (1896). Congress's authority to "formulat[e] . . . policies" concerning the entry of noncitizens "has become about as firmly imbedded in the legislative and judicial tissues of our body politic as any aspect of our government," representing "not merely 'a page of history,' but a whole volume." *Galvan* v. *Press*, 347 U. S. 522, 531 (1954) (citation omitted). "[T]he Court's general reaffirmations of this principle have been legion." *Mandel*, 408 U. S., at 765–766; see also *id.*, at 765 ("[T]he power to exclude aliens is 'inherent in sovereignty, necessary for maintaining normal international relations and defending the country against foreign encroachments and dangers—a power to be exercised exclusively by the political branches of government'").[8] While "families of putative immigrants

_____

[7] The dissent criticizes *Knauff* because the Attorney General, under pressure from Congress, ultimately revisited his decision and admitted Knauff as a lawful permanent resident. *Post*, at 940. But the history of the case does not establish that the Court was wrong to decline to review the Attorney General's decision. It reflects a decision that was made by the political branches and reversed through the political process. Moreover, *Knauff* remains good law that we have repeatedly reaffirmed. *Dept. of Homeland Security* v. *Thuraissigiam*, 591 U. S. 103, 138–139 (2020).

[8] The dissent barely acknowledges that any of this precedent exists. In fact, rather than recognizing the prerogatives of the political branches in this area, the dissent criticizes the United States' immigration policy, *post*, at 923–925, as well as the competence of the Executive Branch officials who make difficult, high-stakes decisions about which noncitizens seeking entry to the United States pose a threat to national security, *post*, at 925–927. Perhaps our dissenting colleagues are well-equipped to set immigration pol-

certainly have an interest in their admission," it is a "fallacy" to leap from that premise to the conclusion that United States citizens have a " 'fundamental right' " that can limit how Congress exercises "the Nation's sovereign power to admit or exclude foreigners." *Fiallo*, 430 U. S., at 795, n. 6.

To be sure, Congress can use its authority over immigration to prioritize the unity of the immigrant family. *Din*, 576 U. S., at 97 (plurality opinion). See, *e. g.*, § 1151(b)(2) (A)(i) (exempting "immediate relatives" from certain numerical quotas). It has frequently done just that. But the Constitution does not *require* this result; moreover, Congress's generosity with respect to spousal immigration has always been subject to restrictions, including bars on admissibility. This is an area in which more than family unity is at play: Other issues, including national security and foreign policy, matter too. Thus, while Congress may show special solicitude to noncitizen spouses, such solicitude is "a matter of legislative grace rather than fundamental right." *Din*, 576 U. S., at 97 (plurality opinion). Muñoz has pointed to no evidence suggesting otherwise.[9]

## IV

As the State Department observes, Muñoz's claim to a procedural due process right in *someone else's* legal proceeding would have unsettling collateral consequences. Consider

icy and manage border security, but the Constitution entrusts those tasks to the political branches.

[9] The dissent never addresses the actual issue in this case, which is whether the Judiciary has any authority to review visa determinations made by the State Department. Instead, the dissent chooses the rhetorically easier path of charging the Court with endangering the fundamental right to marriage. See *post*, at 931–934. To be clear: Today's decision does not remotely call into question any precedent of this Court, including those protecting marriage as a fundamental right. By contrast, the dissent would upend more than a century's worth of this Court's precedent regarding the doctrine of consular nonreviewability, not to mention equally longstanding congressional and Executive Branch practice. *Ibid.*

where her logic leads: Could a wife challenge her husband's "assignment to a remote prison or to an overseas military deployment, even though prisoners and service members themselves cannot bring such challenges"? Reply Brief 13. Could a citizen assert procedural rights in the removal proceeding of her spouse? Brief for Petitioners 30. Muñoz's position would usher in a new strain of constitutional law, for the Constitution does not ordinarily prevent the government from taking actions that "'indirectly or incidentally'" burden a citizen's legal rights. *Castle Rock* v. *Gonzales*, 545 U. S. 748, 767 (2005) (quoting *O'Bannon* v. *Town Court Nursing Center*, 447 U. S. 773, 788 (1980)).

Our decision in *O'Bannon* is illustrative. There, a group of nursing-home residents alleged that the government had violated their liberty interests when it decertified their nursing home without providing them a hearing. 447 U. S., at 777–781, 784. We acknowledged that the residents would suffer harm from the government's decision. *Id.*, at 784, and n. 16. But we held that absent a "direct restraint on [their] liberty]," the decision did not implicate their due process rights. *Id.*, at 788. The decertification decision imposed only an *indirect* harm. We explained that the residents were akin to "members of a family who have been dependent on an errant father." *Ibid.* Although "they may suffer serious trauma if he is deprived of his liberty or property as a consequence of criminal proceedings," such family members "surely . . . have no constitutional right to participate in his trial or sentencing procedures." *Ibid.* The same principle governs here. Muñoz has suffered harm from the denial of Asencio-Cordero's visa application, but that harm does not give her a constitutional right to participate in his consular process.

Lest there be any doubt, *Mandel* does *not* hold that citizens have procedural due process rights in the visa proceedings of others. The Ninth Circuit seems to have read *Mandel* that way, but that is a misreading.

In *Mandel*, the Attorney General refused to waive inadmissibility and grant Ernest Mandel, a self-described "'revolutionary Marxist,'" a temporary visa to attend academic conferences in the United States. 408 U. S., at 756. A group of professors sued on the ground that the Executive's discretion to grant a waiver was limited by their First Amendment right to hear Mandel speak; they insisted that "the First Amendment claim should prevail, at least where no justification is advanced for denial of a waiver." *Id.,* at 769. In response, the Attorney General asserted that "Congress has delegated the waiver decision to the Executive in its sole and unfettered discretion, and any reason or no reason may be given." *Ibid.*

But because "the Attorney General *did* inform Mandel's counsel of the reason for refusing him a waiver," the Court chose not to resolve this statutory argument. *Ibid.* (emphasis added). Instead, it said that so long as the Executive gives a "facially legitimate and bona fide reason" for denying a waiver under § 212(a)(28) of the INA—the statutory provision at issue—"the courts will neither look behind the exercise of that discretion, nor test it by balancing its justification against the First Amendment interests of those who seek personal communication with the applicant." *Id.,* at 770. The Court expressly declined to address whether a constitutional challenge would "be available for attacking [an] exercise of discretion for which no justification whatsoever is advanced." *Ibid.*

Thus, the "facially legitimate and bona fide reason" in *Mandel* was the justification for avoiding a difficult question of statutory interpretation; it had nothing to do with procedural due process. Indeed, a procedural due process claim was not even before the Court. The professors argued that the denial of Mandel's visa directly deprived them of their First Amendment rights, *not* that their First Amendment rights entitled them to procedural protections in Mandel's visa application process. *Id.,* at 754. To make an argument

logically analogous to that of the professors, Muñoz would have to claim that the denial of Asencio-Cordero's visa violated her substantive due process right to bring her noncitizen spouse to the United States—thereby triggering the State Department's obligation to demonstrate why denying him the visa is the least restrictive means of serving the Government's interest in national security. But, as we have explained, Muñoz has disavowed that argument, which cannot succeed in any event because the asserted right is not a longstanding and "'deeply rooted'" tradition in this country. *Glucksberg*, 521 U. S., at 721.

The bottom line is that procedural due process is an odd vehicle for Muñoz's argument, and *Mandel* does not support it. Whatever else it may stand for, *Mandel* does not hold that a citizen's independent constitutional right (say, a free speech claim) gives that citizen a procedural due process right to a "facially legitimate and bona fide reason" for why someone else's visa was denied. And Muñoz is not constitutionally entitled to one here.

*          *          *

The judgment of the Ninth Circuit is reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE GORSUCH, concurring in the judgment.

A consular officer denied Sandra Muñoz's husband a visa to come to and live lawfully in the United States. 526 F. Supp. 3d 709, 713–714 (CD Cal. 2021). In doing so, the officer simply cited 8 U. S. C. §1182(a)(3)(A)(ii), a provision of the Immigration and Nationality Act that makes inadmissible any person a consular officer "has reasonable ground to believe . . . seeks to enter the United States to engage . . . in . . . any other unlawful activity." Eventually, Ms. Muñoz sued for further explanation of that decision. See App. 2,

8–9. The government, she claimed, needed to identify for her not just the statute on which it based its decision, but also the "'discrete factual predicates'" on which it relied. *Id.*, at 8, ¶36.

Over the course of this litigation, the United States has given Ms. Muñoz what she requested. As the Ninth Circuit recognized, the United States has now revealed the factual basis for its decision to deny her husband a visa. 50 F. 4th 906, 919–920 (2022); see App. to Pet. for Cert. 124a; App. 76. In this Court, too, the government has assured Ms. Muñoz that she has a chance to use and respond to that information. She can again seek her husband's admission to this country, the government says—and this time she will be armed with an understanding of why the government denied the last application. Tr. of Oral Arg. 45, 104.

Those developments should end this case. With no more information to uncover and no bar to trying for admission again, nothing is left for a court to address through this litigation. In particular, the constitutional questions presented by the government no longer have any practical relevance here. Whether or not Ms. Muñoz had a constitutional right to the information she wanted, the government gave it to her. I therefore would reverse the Ninth Circuit's decision without reaching the government's constitutional arguments. See *City of Mesquite* v. *Aladdin's Castle, Inc.*, 455 U. S. 283, 294–295 (1982). At the same time, I do not cast aspersions on the motives of my colleagues who do reach the government's arguments. They may see the case differently than I do, but their decision and rationales are essentially those the Solicitor General and the Department of State urged this Court to adopt.

JUSTICE SOTOMAYOR, with whom JUSTICE KAGAN and JUSTICE JACKSON join, dissenting.

"The right to marry is fundamental as a matter of history and tradition." *Obergefell* v. *Hodges*, 576 U. S. 644, 671 (2015). After U. S. citizen Sandra Muñoz and her Salvado-

SOTOMAYOR, J., dissenting

ran husband spent five years of married life in the United States, the Government told her that he could no longer re-enter the country. If she wanted to live together with him and their child again, she would have to move to El Salvador. The reason? A consular officer's bare assertion that her husband, who has no criminal record in the United States or El Salvador, planned to engage in "unlawful activity." 8 U. S. C. § 1182(a)(3)(A)(ii). Muñoz argues that the Government, having burdened her fundamental right to marriage, owes her one thing: the factual basis for excluding her husband.

The majority could have resolved this case on narrow grounds under longstanding precedent. This Court has already recognized that excluding a noncitizen from the country can burden the constitutional rights of citizens who seek his presence. See *Kleindienst* v. *Mandel*, 408 U. S. 753, 765–770 (1972). Acknowledging the Government's power over admission and exclusion, the *Mandel* Court held that "a facially legitimate and bona fide reason" for the exclusion sufficed to justify that burden. *Id.*, at 770. In this case, after protracted litigation, the Government finally explained that it denied Muñoz's husband a visa because of its belief that he had connections to the gang MS–13. Regardless of the validity of that belief, it is a "facially legitimate and bona fide reason." *Ibid.*; see also *ante*, at 919–920 (GORSUCH, J., concurring in judgment). Under this Court's precedent, that is enough.

Instead, the majority today chooses a broad holding on marriage over a narrow one on procedure.[1] It holds that

_____

[1] The Government asked this Court to review three questions:

"1. Whether a consular officer's refusal of a visa to a U. S. citizen's noncitizen spouse impinges upon a constitutionally protected interest of the citizen.

"2. Whether, assuming that such a constitutional interest exists, notifying a visa applicant that he was deemed inadmissible under 8 U. S. C. 1182(a)(3)(A)(ii) suffices to provide any process that is due.

"3. Whether, assuming that such a constitutional interest exists and that citing Section 1182(a)(3)(A)(ii) is insufficient standing alone, due process requires the government to provide a further factual basis for the visa denial 'within a reasonable time,' or else forfeit

SOTOMAYOR, J., dissenting

Muñoz's right to marry, live with, and raise children alongside her husband entitles her to nothing when the Government excludes him from the country. Despite the majority's assurance two Terms ago that its eradication of the right to abortion "does not undermine . . . in any way" other entrenched substantive due process rights such as "the right to marry," "the right to reside with relatives," and "the right to make decisions about the education of one's children," the Court fails at the first pass. *Dobbs* v. *Jackson Women's Health Organization*, 597 U. S. 215, 256–257 (2022). Because, to me, there is no question that excluding a citizen's spouse burdens her right to marriage, and that burden requires the Government to provide at least a factual basis for its decision, I respectfully dissent.

I

A

Marriage is not an automatic ticket to a green card. A married citizen-noncitizen couple must jump through a series of administrative hoops to apply for the lawful permanent residency that marriage can confer. Noncitizen spouses coming from abroad must apply for a visa to enter the United States. In certain cases, however, the law requires even couples who meet and marry in the United States to send the noncitizen spouse back to his country of origin to do the same thing. In doing so, the couple must take an enormous risk to pursue the stability of lawful immigration status: the risk that when the noncitizen spouse tries to reenter the United States, he will face unexpected exile.

---

the ability to invoke consular nonreviewability in court." Pet. for Cert. I.

This Court granted certiorari limited to the first and second questions. 601 U. S. —— (2024). The majority chooses to decide this case on the first question presented rather than "assuming that such a constitutional interest exists" and determining what "process . . . is due" (the second question presented). Pet. for Cert. I.

SOTOMAYOR, J., dissenting

In technical immigration terms, a noncitizen spouse applying for a green card seeks to "[a]djus[t]" his immigration "status" from "nonimmigrant to that of [a] person admitted for permanent residence." 8 U. S. C. §1255. To do so, the citizen spouse must petition the Government on the noncitizen's behalf. The citizen spouse first sends United States Citizenship and Immigration Services (USCIS) a petition to classify the noncitizen spouse as an "immediate relative." §§1151(b)(2)(A)(i), 1154(a)(1)(A). Once USCIS approves the petition, a noncitizen spouse who is already in the United States can then apply to adjust his status to lawful permanent resident without leaving the country. See §1255(a). For a noncitizen spouse living outside of the United States, however, USCIS first approves the immediate-relative petition, but then sends it to the consulate of the country where the noncitizen spouse lives for processing. See §1154(b); 22 CFR §§42.42, 42.61 (2023). A consular officer interviews the noncitizen spouse and makes the final admission decision. See 8 U. S. C. §§1201, 1202(f).

Because of idiosyncrasies in our immigration system, not all noncitizen spouses living in the United States can adjust their status with USCIS. Even when a couple meets, marries, and lives in the United States, the noncitizen spouse may instead have to travel back to his country of origin for consular processing if he was never formally "inspected and admitted or paroled" at the Border. §1255(a). A noncitizen who entered without "inspect[ion]" in this way typically cannot adjust his status from within the United States based on an immediate-relative petition. See *ibid.* Once the citizen spouse submits the petition to USCIS, the noncitizen spouse must return to his country of origin and meet with a consular officer, who will then adjudicate his application. See 22 CFR §§42.42, 42.61, 42.62.

Living in the United States after initially having entered without inspection is not unusual. In fact, the Government endorses the presence of many of these members of our na-

tional community.    Recipients under the Deferred Action for Childhood Arrivals (DACA) program, for instance, may have been brought across the border by their parents without inspection.    Even though DACA status entitles them to work and live in the country without the immediate threat of removal, see 8 CFR § 236.21(c) (2023), it does not change their initial entry designation.    As of the end of 2023, there were roughly 530,000 active DACA recipients in the United States.    See Dept. of Homeland Security (DHS), USCIS, Count of Active DACA Recipients by Month of Current DACA Expiration (as of Dec. 31, 2023).    The same is true of the approximately 680,000 holders of Temporary Protected Status (TPS), who have been designated temporarily unable to return to their home countries because of war, natural disasters, or other extraordinary circumstances.    See DHS, Citizenship and Immigration Services Ombudsman, Ann. Rep. 45 (June 30, 2023); *Sanchez* v. *Mayorkas*, 593 U. S. 409, 419 (2021) (holding that TPS status did not change an entry without inspection into a lawful admission that would allow adjustment to lawful permanent residency from within the United States).    Even when married to a U. S. citizen, DACA recipients and TPS holders are barred from adjusting status within the United States if they entered without inspection.    See 8 U. S. C. § 1255(a).

Ironically, the longer the noncitizen spouse has lived in the United States, the more difficult and uncertain the process to adjust to lawful status can become.    A noncitizen who initially entered without inspection will accrue "unlawful presence," which can bar him from reentering the country if he leaves.    § 1182(a)(9)(B).    If a noncitizen who has lived in the United States between six months and one year leaves and tries to reenter, he will be subject to a 3-year reentry bar. § 1182(a)(9)(B)(i)(I).    If he has lived in the United States for more than a year and tries to reenter, he faces a 10-year ban.    § 1182(a)(9)(B)(i)(II).

SOTOMAYOR, J., dissenting

This scheme places couples who meet and marry in the United States in a difficult position if the noncitizen spouse entered without inspection.  The couple can continue to live with one spouse in a precarious immigration status; or, they can seek the stability of permanent residency for the noncitizen spouse but face a potential multiyear exile when he leaves and applies for reentry.

Recognizing this difficult choice, USCIS allows a noncitizen spouse to apply for a waiver of inadmissibility for any accrued unlawful presence before departing the United States for his consular interview.  To obtain such a waiver, the noncitizen spouse must show that the citizen spouse will suffer "extreme hardship" if her noncitizen spouse is not admitted.  § 1182(a)(9)(B)(v).  Then, once the noncitizen spouse returns to his country of origin, if a consular officer approves his visa application, he can reenter free from the inadmissibility bar.

Consular officers fall under the State Department, see § 1104(a), not DHS, which oversees USCIS, see 6 U. S. C. § 271(a).  Even though DHS officers and consular officers make admission determinations under the same substantive laws, see § 1182, in reality, a noncitizen seeking admission via consular processing faces a far higher risk of arbitrary denial with far less opportunity for review than a noncitizen seeking admission from DHS.

DHS officers are constrained by a framework of required process that does not apply to consular processing.  A noncitizen denied adjustment of status in the United States must receive notice and the reasons for a denial.  See 8 CFR § 245.2(a)(5)(i); DHS, USCIS, Policy Manual, vol. 7, pt. A, ch. 11—Decision Procedures (June 14, 2024) (requiring that a denial notice either "[e]xplain what eligibility requirements are not met and why they are not met" or "[e]xplain the positive and negative factors considered, the relative weight given to each factor individually and collectively, and why the nega-

tive factors outweigh the positive factors"). He can renew his application in removal proceedings before an immigration court, see 8 U. S. C. § 1229b(b)(1), where DHS must present any evidence against him in adversarial proceedings, see §§ 1229(a), 1229a(b)(4)(B), 1229a(c)(3). From those removal proceedings, a noncitizen can petition for review to the Board of Immigration Appeals (BIA), see 8 CFR § 1003.1(b), and, ultimately, a federal court of appeals, see 8 U. S. C. § 1252(a).

In contrast, a noncitizen denied admission via consular processing is entitled to nothing more than a cite to the statute under which the consular officer decided to exclude him. § 1182(b)(1).[2] He has no opportunity for administrative or judicial review, and can only submit more evidence and request reconsideration. 22 CFR § 42.81(e). Former consular officers tell this Court that this lack of accountability, coupled with deficient information and inconsistent training, means decisions often "rely on stereotypes or tropes," even "bias or bad faith." Brief for Former Consular Officers as *Amici Curiae* 8. Visa applicants may "experience disparate outcomes based on nothing more than the luck or misfortune of which diplomatic post and consular officer . . . they happen to be assigned." *Id.*, at 8–9. The State Department's Office of the Inspector General has documented numerous deficiencies in consular processing across several continents. See, *e. g.*, ISP–I–19–14, Inspection of Embassy Bogota, Colombia, p. 16 (Apr. 2019) (finding consular managers in Bogota required visa adjudicators to maintain an average of 30 in-person interviews per hour). Supervisors are required by the State Department to review a certain percentage of visa denials but often fail to do so. See, *e. g.*, Office of Inspector General, ISP–I–19–17, Inspection of Embassy Santo Domingo, Dominican Republic, p. 12 (July 2019) (finding "man-

---

[2] As the majority notes, if the consular officer denies admission based on "certain grounds related to crime and national security," a noncitizen is entitled to "no explanation" at all. *Ante*, at 904 (citing 8 U. S. C. § 1182(b)(3)).

agers did not review 284 (23 percent) of the refusals that should have been reviewed between April 1 and June 30, 2018"); Office of Inspector General, ISP–I–16–24A, Inspection of Embassy Ankara, Turkey, p. 20 (Sept. 2016) (finding visa adjudicator failed to review the required 10% of visa issuances and 20% of visa denials).

When the Government requires one spouse to leave the country to apply for immigration status based on his marriage, it therefore asks him to give up the process he would receive in the United States and subject himself to the black box of consular processing.

B

Muñoz, a celebrated workers' rights lawyer from Los Angeles, California, met Luis Asencio-Cordero in 2008, three years after he had arrived in the United States. They have been married since 2010 and have a child together. In 2013, Muñoz filed an immediate-relative petition for her husband, which USCIS approved. Because Asencio-Cordero had originally entered the United States without inspection, the Government required him to return to El Salvador, his country of origin, for consular processing to obtain his immigrant visa. Yet he also faced a bar to reentry if he left the country. DHS granted him a waiver of this bar upon his anticipated return to the United States because of the "extreme hardship" Muñoz would suffer if he were excluded. 8 U. S. C. § 1182(a)(9)(B)(v). In April 2015, Asencio-Cordero traveled from California to El Salvador. That was the last time he stood on American soil.

Asencio-Cordero attended the initial consular interview in San Salvador on May 28, 2015. In December 2015, a consular officer denied his visa application. As justification, the denial cited only to § 1182(a)(3)(A)(ii). That statute provides that any noncitizen "who a consular officer . . . knows, or has reasonable ground to believe, seeks to enter the United States to engage solely, principally, or incidentally in . . . any other unlawful activity . . . is inadmissible." In other words,

the consular officer excluded Asencio-Cordero based on a belief that he planned to engage in some unspecified unlawful conduct upon return to the United States. "[U]nlawful activity" could mean anything from jaywalking to murder.

Asencio-Cordero has no criminal history in the United States or El Salvador. See 50 F. 4th 906, 911 (CA9 2022); Brief for Respondents 8, n. 5 ("It is uncontested that Asencio-Cordero has never been charged with any crime"). With no obvious justification for the consular officer's belief, Muñoz and Asencio-Cordero asked for reconsideration. Muñoz sought the help of Congresswoman Judy Chu, who sent a letter to the State Department on Muñoz's behalf. The following day, the consulate responded to the letter again with only a citation to § 1182(a)(3)(A)(ii). In January and April 2016, Muñoz asked the State Department for the factual basis for her husband's inadmissibility. She and her husband provided evidence of her accolades at work and attestations of Asencio-Cordero's good moral character. A few days later, the consulate notified Muñoz that the State Department had reviewed the denial and concurred with the consular officer's decision. It denied reconsideration.

After the consulate denied reconsideration, Muñoz and her husband wrote to the State Department again requesting a factual basis for the inadmissibility decision. Asencio-Cordero has no criminal record, but he does have several tattoos from his teenage years. App. 22. They depict a range of subjects, including "Our Lady of Guadalupe, Sigmund Freud, a 'tribal' pattern with a paw print, and theatrical masks with dice and cards." Brief for Respondents 2, n. 2. Some of these images have deep significance in Latin American culture. See, *e. g.*, Brief for Professors and Scholars as *Amici Curiae* 8–10 ("Many Latin Americans view La Virgen de Guadalupe as a special protector, and as a symbol of pan-Latinx identity that transcends attachment to any one geography"). Some also happen to appear on gang members.

SOTOMAYOR, J., dissenting

See *ibid.* (noting that "law enforcement agencies and officials often use tattoos of common Catholic imagery . . . as indicia of gang membership"). Speculating about potential bases for a visa denial, Muñoz and her husband included additional evidence from a court-approved gang expert in their letter to the State Department. The expert reviewed Asencio-Cordero's tattoos and concluded that none were "'related to any gang or criminal organization in the United States or elsewhere.'" 50 F. 4th, at 911. The State Department responded that it lacked authority to overturn consular decisions and "'concurred in the finding of ineligibility.'" *Ibid.* The consulate followed up in May 2016, a year after Asencio-Cordero's initial interview, by listing all the entities that had reviewed the visa application and noting that "'there is no appeal.'" *Ibid.*

It was only after Muñoz and her husband sued the Government in Federal District Court that they finally received the factual basis for the denial. After almost two years of litigation, the Government submitted a declaration from a State Department attorney-adviser. *Id.*, at 912. That declaration stated that the consular officer denied Asencio-Cordero's visa application under §1182(a)(3)(A)(ii) because "'based on the in-person interview, a criminal review of Mr. Asencio Cordero and a review of . . . Mr. Asencio Cordero's tattoos, the consular officer determined that Mr. Asencio Cordero was a member of a known criminal organization . . . specifically MS-13.'" *Ibid.* (alterations omitted).

The Court of Appeals ruled in Muñoz's favor. It held that the Government's reason was too little, too late. The denial of her husband's visa burdened Muñoz's right to marriage, and the Government had provided inadequate process. Even though the Government provided a "facially legitimate and bona fide" reason, that reason was not "timely" enough to satisfy constitutional due process requirements. *Id.*, at 919–921. This Court granted the Government's petition for a writ of certiorari. 601 U. S. —— (2024).

SOTOMAYOR, J., dissenting

## II

There was a simple way to resolve this case. I agree with JUSTICE GORSUCH that "the United States has now revealed the factual basis for its decision to deny [Muñoz's] husband a visa," and she has thus received whatever process she was due. *Ante,* at 920 (opinion concurring in judgment).[3] That could and should have been the end of it. Instead, the majority swings for the fences. It seizes on the Government's invitation to abrogate the right to marriage in the immigration context and sharply limit this Court's longstanding precedent.

Muñoz has a constitutionally protected interest in her husband's visa application because its denial burdened her right to marriage. She petitioned USCIS to recognize their marriage so that her husband could remain lawfully beside her and their child in the United States. It was the extreme hardship Muñoz faced from her husband's exclusion that formed the basis for USCIS's waiver of his inadmissibility. For the majority, however, once Muñoz's husband left the country in reliance on those approvals, their marriage ceased to matter. Suddenly, the Government owed her no explanation at all.

The constitutional right to marriage is not so flimsy. The Government cannot banish a U. S. citizen's spouse and give

---

[3] Unlike JUSTICE GORSUCH, I would vacate and remand the opinion below. The Court of Appeals and District Court correctly resolved the two questions on which this Court granted certiorari. The Ninth Circuit nevertheless vacated the District Court's judgment and remanded based on the answer to a third question, which is not before this Court. See n. 1, *supra*; 50 F. 4th 906, 923–924 (2022) ("Because no 'fact in the record' justifying the denial of Asencio-Cordero's visa was made available to [Muñoz and her husband] until nearly three years had elapsed after the denial, and until after litigation had begun, we conclude that the government did not meet the notice requirements of due process when it denied Asencio-Cordero's visa"). I would let the Ninth Circuit decide in the first instance the effect of a Court holding that Muñoz received all the process she was constitutionally due.

only a bare statutory citation as an excuse. By denying Muñoz the right to a factual basis for her husband's exclusion, the majority departs from longstanding precedent and gravely undervalues the right to marriage in the immigration context.

### A

The constitutional right to marriage has deep roots. "[M]arriage," this Court said over a century ago, "is something more than a mere contract." *Maynard* v. *Hill*, 125 U. S. 190, 210–211 (1888). It is "the most important relation in life," *id.*, at 205, and "the foundation of the family," *id.*, at 211. This Court has described it in one breath as the right "to marry, establish a home and bring up children," a right "long recognized at common law as essential to the orderly pursuit of happiness by free men." *Meyer* v. *Nebraska*, 262 U. S. 390, 399 (1923). In upholding the right of Mildred and Richard Loving to have their marriage license from the District of Columbia recognized by Virginia, this Court emphasized that "[m]arriage is one of the 'basic civil rights of man,' fundamental to our very existence and survival." *Loving* v. *Virginia*, 388 U. S. 1, 12 (1967) (quoting *Skinner* v. *Oklahoma ex rel. Williamson*, 316 U. S. 535, 541 (1942)). Indeed, the right to marriage was one of the first building blocks of substantive due process. The right was so "'fundamental'" and "'implicit in the concept of ordered liberty'" that the *Roe* Court invoked it as part of the foundation underlying the right to abortion. *Roe* v. *Wade*, 410 U. S. 113, 152–153 (1973) (cataloguing existing substantive due process rights as extending to "marriage, procreation, contraception, family relationships, and child rearing and education" (citations omitted)), overruled, *Dobbs*, 597 U. S. 215.

Almost 10 years ago, this Court vindicated the expansiveness of the right to marriage. It upheld the right of James Obergefell and his terminally ill husband, John Arthur, to have their marriage from Maryland recognized in Ohio. Rejecting the idea that "Ohio can erase [Obergefell's] marriage

to John Arthur for all time" by declining to place Obergefell as the surviving spouse on Arthur's death certificate, this Court reasoned that "marriage is a right 'older than the Bill of Rights.'" *Obergefell*, 576 U. S., at 666, 678. Marriage "'fulfils yearnings for security, safe haven, and connection that express our common humanity.'" *Id.*, at 666. "Marriage responds to the universal fear that a lonely person might call out only to find no one there. It offers the hope of companionship and understanding and assurance that while both still live there will be someone to care for the other." *Id.*, at 667.

The majority, ignoring these precedents, makes the same fatal error it made in *Dobbs*: requiring too "'careful [a] description of the asserted fundamental liberty interest.'" *Ante*, at 910 (quoting *Washington* v. *Glucksberg*, 521 U. S. 702, 721 (1997)); cf. *Dobbs*, 597 U. S., at 374–375 (Breyer, SOTOMAYOR, and KAGAN, JJ., dissenting). The majority faults Muñoz's invocation of the "'fundamental right to marriage'" as "difficult to pin down." *Ante*, at 910. Instead, it tries to characterize her asserted right as "an entitlement to bring [her husband] to the United States," even though it acknowledges that Muñoz "disclaims that characterization." *Ante*, at 910–911.

*Obergefell* rejected what the majority does today as "inconsistent with the approach this Court has used in discussing [the] fundamental rights" of "marriage and intimacy." 576 U. S., at 671. Cataloguing a half century of precedent on the right to marriage, the Court stressed that "*Loving* did not ask about a 'right to interracial marriage'; *Turner* did not ask about a 'right of inmates to marry'; and *Zablocki* did not ask about a 'right of fathers with unpaid child support duties to marry.'" *Ibid.* Instead, "each case inquired about the right to marry in its comprehensive sense" of "marriage and intimacy." *Ibid.* Similarly, Muñoz does not argue that her marriage gives her the right to immigrate her husband. She instead advances the reasonable position that blocking her from living with her husband in the United

SOTOMAYOR, J., dissenting

States burdens her right "to marry, establish a home and bring up children" with him. *Meyer*, 262 U. S., at 399.

This Court has never required that plaintiffs be fully prevented from exercising their right to marriage before invoking it. Instead, the question is whether a challenged government action burdens the right. For example, the Court in *Zablocki* v. *Redhail*, 434 U. S. 374 (1978), examined the "burde[n]" placed on fathers by a statute that required a hearing to "counsel" them "as to the necessity of fulfilling" any outstanding child support obligations before being granted permission to marry. *Id.*, at 387–388. The Court in *Turner* v. *Safley*, 482 U. S. 78 (1987), applied *Zablocki* to incarcerated people to hold that the particular prison marriage restriction at issue "impermissibly burden[ed] the right to marry." 482 U. S., at 97. There can be no real question that excluding a citizen's spouse from the country "burdens" the citizen's right to marriage as this Court has repeatedly defined it. This Court has never held that a married couple's ability to move their home elsewhere removes the burden on their constitutional rights. It did not tell Richard and Mildred Loving to stay in the District of Columbia or James Obergefell and John Arthur to stay in Maryland. It upheld their ability to exercise their right to marriage wherever they sought to make their home.

Muñoz may be able to live in El Salvador alongside her husband or at least visit him there, but not everyone is so lucky. The majority's holding will also extend to those couples who, like the Lovings and the Obergefells, depend on American law for their marriages' validity. Same-sex couples may be forced to relocate to countries that do not recognize same-sex marriage, or even those that criminalize homosexuality. American husbands may be unable to follow their wives abroad if their wives' countries of origin do not recognize derivative immigration status from women (as was the case in this country for many years, see *ante*, at 913 (noting visa "quotas . . . for female citizens with noncitizen husbands"

until 1952)).  The majority's failure to respect the right to marriage in this country consigns U. S. citizens to rely on the fickle grace of other countries' immigration laws to vindicate one of the " 'basic civil rights of man' " and live alongside their spouses.  *Loving*, 388 U. S., at 12.

B

Given that the Government has burdened Muñoz's right to marriage by excluding her husband from the country, the question is the remedy for that burden.  Muñoz argues that this burden triggers procedural due process protections in her husband's visa denial.  Emphasizing that substantive due process rights like the right to marriage usually trigger strict scrutiny, the majority faults Muñoz for creating a right "in a category of one: a substantive due process right that gets only procedural due process protection."  *Ante*, at 911. Muñoz, however, did not create that category of rights. This Court did.  See *Mandel*, 408 U. S., at 768–770.  This Court already set the ground rules for when the Government's exercise of its extensive power over the exclusion of noncitizens burdens a U. S. citizen's constitutional rights. See *id.*, at 770.  In short, a fundamental right may trigger procedural due process protections over a noncitizen's exclusion, but such protections are limited.  See *ibid.*

Noncitizens who apply for visas from outside the United States have no constitutional entitlement to enter the country, and therefore typically have no constitutional process protections in the visa application themselves.  See *Landon* v. *Plasencia*, 459 U. S. 21, 32 (1982).  In contrast, noncitizens who already live in the United States whom the Government seeks to remove have procedural due process protections during that removal.  See *Yick Wo* v. *Hopkins*, 118 U. S. 356, 369 (1886); *Zadvydas* v. *Davis*, 533 U. S. 678, 693 (2001). Had the Government sought to remove Muñoz's husband when they were living together in the United States, he would have had his own constitutional protections in those

proceedings. Instead, because the Government forced him to leave the country and reenter in order to adjust his immigration status, he lost them.

Not only do noncitizens seeking to enter the United States lack constitutional process rights in their visa applications. This Court has further insulated the Government's visa determinations from review by declining to evaluate them at all. See *ante,* at 907–908. This judge-made "doctrine of consular nonreviewability" reflects the Judicial Branch's recognition that the "'admission and exclusion of foreign nationals'" is an area of unusually heightened congressional and executive power. *Ibid.*[4] When the denial of a noncitizen's visa burdens a U. S. citizen's constitutional rights, however, this Court has had to reconcile the importance of those rights with its recognition of Government authority over visa determinations. In *Mandel*, it set the remedy. The *Mandel* Court held that when a visa denial "implicate[s]" a citizen's rights, a court will not look behind a "facially legiti-

---

[4] Judges created this doctrine because of the otherwise "strong presumption that Congress intends judicial review of administrative action." *Bowen* v. *Michigan Academy of Family Physicians,* 476 U. S. 667, 670 (1986). The majority emphasizes that the Government asked the Court for the holding it reaches today. See *ante,* at 907, n. 3. It is hardly unusual for the Government to ask this Court for less judicial review over its immigration decisions. See, *e. g., Wilkinson* v. *Garland,* 601 U. S. 209 (2024) (arguing that eligibility for cancellation of removal is unreviewable); *Santos-Zacaria* v. *Garland,* 598 U. S. 411 (2023) (arguing that noncitizens must request discretionary forms of administrative review before challenging a final order of removal in federal court); *Patel* v. *Garland,* 596 U. S. 328 (2022) (arguing that federal courts lack jurisdiction to review facts found as part of eligibility determination for discretionary relief); *Garland* v. *Aleman Gonzalez,* 596 U. S. 543 (2022) (arguing that district courts lack jurisdiction to entertain noncitizens' requests for class-wide injunctive relief). Unusually, in this case, the Government's argument against review is not based on any statutes passed by Congress but on a doctrine that this Court created itself. Rather than exercise the restraint counseled by *Mandel*, the majority instead chooses to exclude a fundamental right from *Mandel*'s prudent exception. See *infra,* at 936–939.

mate and bona fide" reason for the denial. 408 U. S., at 765, 769.

In *Mandel*, a group of U. S. professors sued the Government over the visa denial of Dr. Ernest E. Mandel, a famous Belgian Marxist. See *id.*, at 756, 759–760. The professors argued that excluding Mandel burdened their First Amendment right to hear and meet with him in person. See *id.*, at 760. The Court agreed that the professors had a First Amendment " 'right to receive information' " from Mandel. *Id.*, at 762, 764. It also emphasized, as the majority does today, Congress's power over the admission and exclusion of noncitizens. See *id.*, at 766–767; *ante*, at 907–908. To avoid the need to balance "the strength of the audience's interest against that of the Government in refusing a waiver to the particular [noncitizen] applicant, according to some as yet undetermined standard," *Mandel*, 408 U. S., at 768–769, the Court instead noted that "the Attorney General did inform Mandel's counsel of the reason for refusing him a waiver. And that reason was *facially legitimate and bona fide.*" *Id.*, at 769 (emphasis added). Therefore, "when the Executive exercises [conditional power to exclude] negatively on the basis of a facially legitimate and bona fide reason, the courts will neither look behind the exercise of that discretion, nor test it by balancing its justification against the First Amendment interests of those who seek personal communication with the applicant." *Id.*, at 770. In other words, when a visa denial burdens a noncitizen's constitutional rights, rather than attempt to balance the competing interests under strict scrutiny, a court should accept the Government's "facially legitimate and bona fide reason." *Ibid.* That minimal requirement ensures that courts do not unduly intrude on "the Government's sovereign authority to set the terms governing the admission and exclusion of noncitizens," *ante*, at 911–912, while also ensuring that the Government does not arbitrarily burden citizens' constitutional rights.

This Court has repeatedly relied on *Mandel*'s test in the immigration context. See, *e. g.*, *Trump* v. *Hawaii*, 585 U. S.

SOTOMAYOR, J., dissenting

667, 703 (2018) (noting that "this Court has engaged in a circumscribed judicial inquiry when the denial of a visa allegedly burdens the constitutional rights of a U. S. citizen"); *Fiallo* v. *Bell*, 430 U. S. 787, 794, 799 (1977) (relying on *Mandel* in declining to "probe and test the justifications for [a] legislative" distinction between mothers and fathers because this Court has applied limited scrutiny to "resolv[e] similar challenges to immigration legislation based on other constitutional rights of citizens").[5]   Indeed, less than a decade ago, six Justices ruling on the exact legal question the Court confronts today would have held that *Mandel* controlled or extended its protections even further in the marriage context. See *Kerry* v. *Din*, 576 U. S. 86, 103–104 (2015) (Kennedy, J.,

─────────

[5] Despite the majority's claim that its decision is the majority rule in the Courts of Appeals, *ante*, at 909, and n. 5, lower courts have rarely reached the question the majority reaches today.   That is because they have relied on *Mandel* to hold that the Government has in any case provided a "'facially legitimate and bona fide'" reason.   See, *e. g.*, *Sesay* v. *United States*, 984 F. 3d 312, 315–316, and n. 2 (CA4 2021); *Del Valle* v. *U. S. Dept. of State*, 16 F. 4th 832, 838–842 (CA11 2021); *Yafai* v. *Pompeo*, 912 F. 3d 1018, 1020–1021 (CA7 2019).   One of the cases the majority cites pre-dates *Mandel*, *Silverman* v. *Rogers*, 437 F. 2d 102 (CA1 1970), and two others reached the majority's holding based only on conclusory assertions, see *Burrafato* v. *U. S. Dept. of State*, 523 F. 2d 554, 555–557 (CA2 1975); *Bright* v. *Parra*, 919 F. 2d 31, 34 (CA5 1990) (*per curiam*).   Only two Circuits have used the majority's reasoning to hold that a U. S. citizen's right to marriage does not trigger the *Mandel* remedy.   In one, the court had an alternative holding that "even if we take [the right to marriage] as a given, the argument fails because the consulate provided a facially legitimate reason for the visa denials."   *Baaghil* v. *Miller*, 1 F. 4th 427, 434 (CA6 2021).   In the other, a concurring judge urged his colleagues to resolve this challenge on the same narrow holding that the majority could have followed today.   See, *e. g.*, *Colindres* v. *U. S. Dept. of State*, 71 F. 4th 1018, 1027 (CADC 2023) (opinion of Srinivasan, J.) ("There is no need for us to take up the merits of [the] constitutional question . . . and I would refrain from doing so.   Rather, we can rest our decision solely on the ground . . . that even assuming [appellant's] fundamental right to marriage includes a protected interest in living in the country with her husband, such that at least some form of due process scrutiny applies, the government's denial of a visa to him afforded her adequate process").

concurring in judgment) ("The reasoning and the holding in *Mandel* control here. . . . Like the professors who sought an audience with Dr. Mandel, [respondent] claims her constitutional rights were burdened by the denial of a visa to a noncitizen, namely, her husband"); *id.*, at 107 (Breyer, J., dissenting) (reasoning that respondent's "liberty interest [in] her freedom to live together with her husband in the United States" is the kind "to which the Due Process Clause grants procedural protection").

Outside the immigration context, this Court has endorsed similar tests in circumstances where there is a heightened underlying governmental power. For instance, in *Turner*, the Court evaluated the right to marriage in the prison context. Even though an incarcerated person "'retains those [constitutional] rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system,'" the Court emphasized that "[t]he right to marry, like many other rights, is subject to substantial restrictions as a result of incarceration." 482 U. S., at 95 (quoting *Pell* v. *Procunier*, 417 U. S. 817, 822 (1974)). Only because the challenged prison regulation there was not "reasonably related" to the government's articulated penological interests, or "legitimate security and rehabilitation concerns," did this Court hold it unconstitutional. *Turner*, 482 U. S., at 95; see *id.*, at 99.

Just as *Turner* looked at burdens on the right to marriage through the narrow lens of "penological interests" to defer to the government's control over prisons, *Mandel* used a "facially legitimate and bona fide reason" to defer to the Government's power over the exclusion of noncitizens. Neither case erased the constitutional right at issue. The Court simply recognized that the right can be substantially limited in areas where the government exercises unusually heightened control.

Applying *Mandel* and *Turner* here, the remedy is clear. The Government's exclusion of Muñoz's husband entitles her

at least to the remedy required in *Mandel*: a "facially legitimate and bona fide reason" for the exclusion.  408 U. S., at 770.

C

The majority resists this conclusion by worrying about its "unsettling collateral consequences." *Ante*, at 916.  The majority poses a series of hypotheticals that it fears will result from recognizing the limited right Muñoz proposes. These fears are groundless.

First, the majority's concern that applying *Mandel* to Muñoz's right to marriage in this case will result in a slippery slope of constitutional challenges is unfounded. Muñoz's right triggers limited process protections in part because her husband lost his own procedural protections when the Government required him to leave the country.  Muñoz's right to marriage raises that floor from zero process to some by requiring the Government to provide a "facially legitimate and bona fide reason" when her husband receives no process.  In contrast, a citizen's liberty interest "in the removal proceeding of her spouse" in the United States, *ante*, at 917, would presumably be limited by the noncitizen's own due process rights in that same proceeding.  Similarly, any challenge from a wife to her husband's "'assignment to a remote prison,'" *ibid.*, would presumably be limited by the criminal procedural protections her husband already received.

Second, the majority's reliance on *O'Bannon* v. *Town Court Nursing Center*, 447 U. S. 773 (1980), is misplaced and highlights the speculative nature of its concerns.  *O'Bannon* rejected a freestanding constitutional interest in avoiding "serious trauma."  *Id.*, at 788.  The residents of a government-funded nursing home sought relief from transfer to alternative housing because of the emotional harm they would suffer from the move.  *Id.*, at 777–781, 784.  Muñoz, however, does not rely on a free-floating emotional harm that separation from her husband will cause.  She invokes her

fundamental right to marry, live, and raise a family with her husband, the right recognized by this Court for centuries. See *supra*, at 931–934. Denying her husband entry to the country directly burdens that right.

In sum, the majority's concerns are unwarranted. There are few circumstances where the limited relief sought by Muñoz would be available.

## III

A "facially legitimate and bona fide" reason may seem like a meager remedy for burdening a fundamental right. Yet even the barest explanation requirement can be powerful. The majority relies heavily on *United States ex rel. Knauff* v. *Shaughnessy*, 338 U. S. 537 (1950). See *ante*, at 908, 914–915. A closer look at the story of Ellen Knauff, however, illustrates the importance of putting the Government to a minimal evidence requirement when a visa denial burdens a constitutional right.

Knauff's U. S. citizen husband sought to bring her to the United States after they married during his deployment to Germany. After this Court upheld her exclusion on undisclosed national security grounds, there was a public outcry. See C. Weisselberg, The Exclusion and Detention of Aliens: Lessons From the Lives of Ellen Knauff and Ignatz Mezei, 143 U. Pa. L. Rev. 933, 958–964 (1995). Both Houses of Congress introduced private bills for her relief and, after the Attorney General rushed to remove Knauff from Ellis Island before Congress could act, Justice Jackson (who had vigorously dissented in the case) issued a stay from this Court. See *id.*, at 958, n. 127. After extensive advocacy, the Attorney General ordered immigration officials to reopen the case. See *id.*, at 961–962. Eventually, Knauff won her case before the BIA when the Government failed to prove up its national security concerns. *Id.*, at 963–964. She was finally admitted as a lawful permanent resident. *Id.*, at 964.

The majority relies heavily on "[t]he rule of *Knauff*": that "the Attorney General has the unchallengeable power to

exclude" a noncitizen. *Ibid.*; *ante*, at 915 (emphasizing that
"'[n]o limits can be put by the courts upon'" the exercise of
the Government's power to "'forbid aliens or classes of aliens
from coming within their borders'"). Yet, "the full story of
Ellen Knauff shows a populace and a Congress unwilling to
accept the exercise of this sort of raw power." Weisselberg,
143 U. Pa. L. Rev., at 964. "Once the government was re-
quired to justify its exclusion decision with substantial and
reliable evidence, in an open proceeding, Knauff gained ad-
mission into the United States." *Ibid.*

Knauff brought her own petition to challenge her exclu-
sion. *Knauff*, 338 U. S., at 539–540. Her husband did not
argue that her exclusion burdened his right to marriage.
Twenty-two years after *Knauff*, however, when faced with
such a challenge, this Court limited the justification that the
Government must provide in these circumstances to a "fa-
cially legitimate and bona fide reason." *Mandel*, 408 U. S.,
at 770. The majority, not content to resolve this case on
even those narrow grounds, instead relieves the Government
of any need to justify itself at all. Knauff's story illustrates
why the right to marriage deserves more. By leaving U. S.
citizens without even a factual basis for their spouses' exclu-
sion, the majority paves the way for arbitrary denials of a
right this Court has repeatedly held among the most impor-
tant to our Nation.

\*    \*    \*

A traveler to the United States two centuries ago reported
that "'[t]here is certainly no country in the world where the
tie of marriage is so much respected as in America.'" *Ober-
gefell*, 576 U. S., at 669 (quoting 1 A. de Tocqueville, Democ-
racy in America 309 (H. Reeve transl., rev. ed. 1900)).
Today, the majority fails to live up to that centuries-old
promise. Muñoz may be able to live with her husband in El
Salvador, but it will mean raising her U. S.-citizen child out-
side the United States. Others will be less fortunate. The
burden will fall most heavily on same-sex couples and others

who lack the ability, for legal or financial reasons, to make a home in the noncitizen spouse's country of origin.   For those couples, this Court's vision of marriage as the "assurance that while both still live there will be someone to care for the other" rings hollow.   *Obergefell,* 576 U. S., at 667.   I respectfully dissent.

Page Proof Pending Publication

REPORTER'S NOTE

The attached opinion has been revised to reflect the usual publication and citation style of the United States Reports.  The revised pagination makes available the official United States Reports citation in advance of publication.   The syllabus has been prepared by the Reporter of Decisions for the convenience of the reader and constitutes no part of the opinion of the Court.   A list of counsel who argued or filed briefs in this case, and who were members of the bar of this Court at the time this case was argued, has been inserted following the syllabus.   Other revisions may include adjustments to formatting, captions, citation form, and any errant punctuation.   The following additional edits were made:

p. 941, line 11: "habeas" is deleted